No. 23,822.

JOHN TOELLE, a Minor, by KATHERINE TOELLE, His Next Friend, *Appellee*, v. THE SELLS-FLOTO SHOWS COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Negligence—Personal Injuries—Proper Party Defendant*. In an action for damages for negligence to an employee of a traveling circus, the evidence examined and held to show that the defendant corporation was the proper party defendant and properly held liable for the negligence which caused his injuries.

2. EVIDENCE—*Correcting Mistake in Depositions Refused—No Error*. A statement or supplementary certificate of a notary and stenographer who took depositions reciting that he had made a mistake in copying the questions and answers, which conformed to no rule of evidence, was properly held inadmissible.

3. SAME—*Title to Corporate Property—Cross-examination of Witnesses*. Cross-examination of witnesses to show possible explanations of nominal transfers of title to corporate property was properly permitted.

4. SAME—*Competent Evidence*. Certain files in the action, the summons, sheriff's return, and answer of defendant, and the testimony of the clerk of the court touching what pleadings had been filed, were admissible in evidence.

5. SAME—*Demurrer Properly Overruled*. Demurrer to evidence and motion for directed verdict, filed in defendant's behalf, were properly overruled.

6. SAME—*Special Questions*. A special question which assumed the truth of a disputed fact was properly refused submission to the jury.

7. SAME—*Rejected Evidence*. Matters offered in evidence and rejected, and brought on the record in support of the motion for a new trial examined, and held not to require the granting of a new trial.

8. Bonds—*Forthcoming Bond—Bond to Pay Judgment.* The difference between a forthcoming bond and a bond to pay a judgment which discharged an attachment discussed.

9. Evidence—*Special Findings.* Special findings of a jury on pertinent issues of fact, when supported by evidence, need not be set aside on a motion to that effect.

10. Instructions. Instructions given and refused, examined and no error discerned therein.

11. Negligence—*Actionable Negligence Shown.* An employer who hires a boy of fourteen years to travel with a circus, on a promise to pay him wages, board and lodging, but the only lodging furnished him is a pile of canvas under circus wagons on a flat car without sides, whereby the lad while asleep is flung from the flat car as the circus train travels around a curve on the railway, is guilty of actionable negligence.

Appeal from Wyandotte district court, division No. 1; Edward L. Fischer, judge. Opinion filed June 10, 1922. Affirmed.

*A. J. Herrod, H. S. Roberts,* both of Kansas City, and *Frank M. Lowe,* of Kansas City, Mo., for the appellant.

*J. H. Brady, T. F. Railsback,* both of Kansas City, and *J. Francis O'Sullivan,* of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

Dawson, J.: This was an action by a boy of fourteen years for injuries sustained through the alleged negligence of the defendant, a concern engaged in operating a circus throughout the country.

Without the knowledge or consent of his parents, a foreman of the circus engaged his services at an agreed compensation of $5.80 per week together with his board and lodging. He was given a meal ticket which entitled him to eat with the circus employees, and a "bunk car" was provided as sleeping quarters, but it was fully occupied by other employees, and when bedtime came the foreman told the lad, "You haven't been here long enough to have a bunk. You got to be here three weeks before you get a regular bunk." The foreman directed another employee to take the plaintiff to a flat car which was to be his temporary sleeping quarters; and for a few nights, as the circus traveled and exhibited in Topeka, Junction City, Hastings, and elsewhere, he slept on some canvas in the flat car under the circus wagons. There were no sideboards on this flat car, and one night in Nebraska while the railway train carrying the circus was rounding a curve, the boy was flung from the flat car and was severely injured. Next morning he was discovered by some

witnesses who saw him leaving the railway track, walking as if he were dazed, "as though he was drunk, staggering and stumbling back and forth across the road." A witness testified:

"Boy was walking like he was all in—dazed—boy walked past us and stopped and sat down in a ditch; he laid down there and then got up and started toward us; his nose was cut, and his eye along the top was cut; had blood all over him, and he was weak; his arm was hurt; Joe Budd and my dad took him to town and to the doctor's office."

The boy's skull was fractured, his eyelid cut, his collar bone broken, likewise his nose and left arm, and three of his ribs were fractured. Some days later his mother came and took him home, and this lawsuit followed.

The plaintiff prevailed, and defendant appeals, assigning various errors, the chief of which raises the question whether the plaintiff sued the right party—whether the liability did not rest on some one other than the Sells-Floto Shows Company, defendant herein. At the trial this was a perplexing question of fact. The evidence on this point was lengthy, complicated and contradictory. It appears that the beneficial ownership and control of the property known as the Sells-Floto circus have been vested for many years in one way or another in two enterprising Denver capitalists, F. G. Bonfils and Harry A. Tammen. These two men have put large sums of money into the circus, and at various times have placed its nominal ownership in one or another of several corporations or similar business concerns which they have caused to be created. In 1907 the titular holder of the property was the American Amusement Company, and at that time Bonfils and Tammen caused the corporate name of the concern to be changed to the Sells-Floto Shows Company. Under that name or a popular abbreviation of it, the Sells-Floto Circus, the concern became widely known throughout the country; and notwithstanding some nominal changes in titular ownership, the institution has preserved as valuable its trade name, "Sells-Floto Circus." Because the beneficial interest of Messrs. Bonfils and Tammen in the circus property had always been virtually complete and exclusive, there was little necessity to maintain the same careful records and transfers of nominal title, such as would have been requisite if there had been other partners or fellow stockholders holding a substantial interest in the concern. There was evidence to show that at one time the property was mortgaged by Bonfils and Tammen as officers and directors of the Sells-Floto Shows Company, a Colorado corporation, to Bonfils and Tammen, as individuals, for

over half a million dollars which was computed to be the amount which these men had put into the circus, and later this mortgage was foreclosed and bought in by the mortgagees. Bonfils and Tammen then gave Henry Gentry an option to lease the circus. Then Bonfils and Tammen transferred the ownership of the circus to a nominal corporation of their creation, the Continental Investment Company. Then the attorney for Bonfils & Tammen organized another nominal corporation, The Champion Shows Company, naming Gentry and certain employees of Bonfils and Tammen as the stockholders, with a nominal capital of $25,000, but no money or other assets, and a lease of the circus property was made in the name of the Continental Investment Company, a lessor, to the Champion Shows Company. Under this nominal arrangement the circus property was operated for two or three years, but also under an arrangement whereby Bonfils and Tammen financed the business and had supervision of its finances, and under which arrangements the nominal lessee made no money for itself. On cross-examination Tammen's testimony abridged, reads:

"I was very much interested in it (the circus's) success; had a great interest in it; since 1902 the witness had had something to do with this property; sometimes it was run in the name of the American Amusement Company; sometimes, Sells Floto Shows Company; sometimes Continental Investment Company; sometimes by just the witness's brother and himself as individuals; sometimes by the Champion Shows Company. . . . The Continental Investment Company was organized about 1916, and it consisted of Bonfils and the witness as principal owners; that they owned all of the stock in it; that their lawyer Bottom got up the Champion Shows Company papers. . . . He and Bonfils own the Continental Shows Company. . . . that this was 'our' circus, 'my adopted thing,' and it will be mine as long as I live; . . . that the witness owns an interest in the physical property of the show. . . . that he had a man to go around with the Champion Shows Company to check up and see how much was being made and spent. . . .

"The minutes of the meeting of the Continental Investment Company was drawn by witness' attorney either at the meetings or afterwards; witness did not remember when the last meeting of the Continental Investment Company was held, couldn't tell what was before the meeting; the Sells Floto Circus is now in witness' individual name. Witness when asked why he had testified yesterday that the Continental Investment Company owned the property, when it had been taken out and placed in his name, answering said 'sometime the end of the season, I think in November.' There was no lease upon the property given anyone at the time of the trial. Witness said he had authority to make a lease, but none had been made; the Continental turned the whole business of this circus over to the witness to operate, just like the 'Sells Floto Shows Company' did."

Neither the Continental Investment Company, nominal lessor, nor the Champion Shows Company, nominal lessee, nor Messrs. Bonfils and Tammen, the beneficial owners of the circus property, have intervened in this lawsuit. The attachment of the circus property promptly brought this defendant into court for all purposes, without tactical or dilatory pleas of any sort. A bond was promptly given in its behalf to pay the judgment—by whom is not shown—but it was not given by the lessee in whom the possession and operation of the circus were nominally vested. If indeed the Sells-Floto Shows Company went out of business in 1916, that fact could readily have been shown beyond cavil by the record of surrendered or canceled charters in the state of its creation. If this circus property were a tract of valuable real estate, it would baffle an expert in the law of conveyancing to tell who holds the fee title at this time, although it is perfectly clear that Messrs. Bonfils and Tammen are and always have been the beneficial owners; and since they have put forth such nominal title holders one after the other as suited their business convenience, with little or no regard to formalities of transfer, the Sells-Floto Shows Company, one of their corporate creatures which has had more to do with the circus than any other, can be held to answer as a defendant in this lawsuit. In so holding, we do not minimize or disparage the familiar principle of corporation law that formally organized and independently conducted corporations are separate legal entities, each having a separate legal status, although the organizers and stockholders may be the same persons. (*The State v. Harvester Co.*, 81 Kan. 610, 615, 106 Pac. 1053.)

John Eberle was the foreman who employed the plaintiff in July, 1920, and when he was injured. Tammen, one of the proprietors of the circus, testified:

"Q. [Counsel for defendant.] I will ask you to state whether or not John Eberle was employed, or in the employ of the 'Sells Floto Shows Company' during the years 1918, 1919, 1920 and 1921? A. Yes, sir."

Eberle's deposition was taken by the defendant:

"Q. Mr. Eberle, what is your position with the Sells-Floto Shows Company? A. Boss canvas man."

Another witness, William Connors, deposed for the defendant:

"Q. Do you work for the Sells-Floto Shows Company? A. Yes, sir.
"Q. How long have you been working for them? A. Ever since they left Boston, about four or five months ago."

There was much testimony to the effect that the circus wagons

Toelle v. Sells-Floto Shows Co.

and circus advertising bills bore the words "Sells Floto Shows Company," although the accuracy of that testimony was persuasively disputed by testimony and evidence to the contrary, which included photographs of circus wagons bearing the words "Sells Floto Circus," and checks, meal tickets and other business papers which bore the legend, "Sells-Floto Circus" in large type followed in less conspicuous type with the words "The Champion Shows Co." But it cannot be gainsaid that under the evidence the jury had a right to determine this stoutly contested question, and find that this defendant, the Sells-Floto Shows Company, was operating the circus at the time the plaintiff was injured. (*Burlington v. Wagoner*, 100 Kan. 439, 164 Pac. 1057.)

Defendant complains because of the trial court's refusal to permit it to correct the depositions of John Eberle and William Connors in which they deposed that they were working for the Sells-Floto Shows Company. Defendant took these depositions but wanted the answers changed to say that the deponents were working for the Sells-Floto Circus. To effect this correction, the defendant offered a certificate of the notary who was also the stenographer who wrote the depositions, reciting that he had made a mistake in copying his stenographic notes, and that the words "Sells-Floto Shows Company" in these depositions should have been written "Sells-Floto Circus"? This certificate was properly rejected. It conformed to none of the rules of evidence. (18 C. J. 722.) Furthermore, once the depositions were taken the plaintiff has as much right to use and rely on them as the defendant. (*Golder v. Golder*, 102 Kan. 486, 170 Pac. 803.)

Error is assigned because the plaintiff was permitted to cross-examine defendant's witnesses touching certain damage or damage claims in Missouri against the Sells-Floto Shows Company which grew out of the collapse of some circus seats. The purpose was to develop a possible explanation of some of the transfers of title to the circus property. Although the court first ruled against this evidence, yet as the trial developed it changed its ruling, and we see no error in permitting a limited inquiry of this sort.

Objection is also made because the summons, the return of the sheriff, and defendant's answer were admitted in evidence. Defendant says:

"The only reason that is now and was at the time of the trial discernible by us was the effort on the part of counsel for appellee to do everything within their power to prejudice the jury."

When these were offered, the court said:

"The Court: I don't understand what it is for.

"[Counsel for plaintiff]: It was issued and they have answered this summons by filing an answer. I next propose to introduce the answer and the record showing that no other motion was filed to this summons.

"The Court: If that is all it is for, all right.

"[Counsel for defendant]: It isn't evidence in the case.

"[Counsel for plaintiff]: Will you admit that you answered, without filing any demurrer or motions to quash?

"[Counsel for defendant]: The record will show whatever we did.

"[Counsel for plaintiff]: You don't care to admit it then? We can find the answer. We offer in evidence the answer, plaintiff's Exhibit 3, a general denial.

"[Counsel for defendant]: To which defendants make the same objection.

"The Court: Overruled. . . .

"The Court: Well, I don't know whether the record should be read or not. What do you want to prove?

"[Counsel for plaintiff]: To show that there wasn't any motion filed prior to the filing of the answer. If they will admit that, we won't have to prove it.

"R. J. McFarland . . . clerk of the district court of Wyandotte county, . . . produced the appearance docket . . . and then testified over the objection of the defendant, which was overruled by the court, that prior to the filing of the answer in this case on the 13th of September, neither a demurrer nor any motion of any kind was filed by the defendant in this case."

In view of the defense that the Sells-Floto Shows Company had been out of business since 1916 and was not operating the circus when the plaintiff was injured, we think these matters were competent. (2 R. C. L. 845, 850.) They tended to show that when the action was begun this defendant came promptly into court in a general appearance, and that the defense afterwards set up was not then seriously contemplated by the defendant and its managing officers.

Error is also assigned in overruling defendant's demurrer to the evidence and defendant's motion for a directed verdict, but in view of what we have set down above, these rulings were obviously correct and require no discussion.

Defendant also complains of the court's refusal to submit a question touching the possible extension of a lease of the circus property. Some other questions, more in point, were submitted and answered:

"Question 1. Who was the owner of the Sells-Floto Circus at the time plaintiff alleges to have been injured? Ans. Sells-Floto Shows Co. . . .

"Question 3. At the time plaintiff received his alleged injuries was the circus being operated under lease? Ans. No. . . .

"Question 7. Was the circus property transferred by Bonfils and Tammen to the Continental Investment Company?  Ans.  Do not know."

Since these findings show that the defendant owned the property and it was not under lease, and the finding "Do not know" means "No" (*Bank v. Claypool*, 91 Kan. 248, 137 Pac. 949; *Sheerer v. Kanavel*, 106 Kan. 220, 187 Pac. 658), the question refused was as effectually answered as if it had been propounded.  Moreover, the question was objectionable because it assumed the earlier existence of a *bona fide* lease, which was one of the contested questions in this lawsuit.  (*Elliott v. Reynolds*, 38 Kan. 274, 16 Pac. 698.)

Defendant's next complaint relates to the rejected proffer of evidence in its behalf.  That part of it which pertained to the correction of alleged errors in the depositions of Eberle and Connors has already been discussed.  Touching the proffered evidence of Otto Floto, Max Levand, and H. S. Roberts, this evidence was submitted as affidavits in support of the motion for a new trial.  In these it was shown that if permitted Floto would have testified that he told the sheriff "that he was attaching the property of the Continental Investment Co.; that the property did not belong to the Sells-Floto Shows Company."

"[Counsel for defendant]: Is your Honor holding that we haven't any right to introduce evidence to impeach this return or attack it?

"The Court: Introduce all the evidence you want to be on the fact, but you can not come in here and testify to a lot of stuff somebody told somebody else.  If the sheriff was on the stand, it would be another matter.

"[Counsel for defendant]: His return is here.

"The Court: Yes; but his return can't be attacked that way.

"[Counsel for plaintiff]: You had a chance to do that five months ago."

The rejected testimony of Levand and Roberts was to the same general effect.  We do not think the rejection of this testimony was prejudicial.  Certainly the question as to the ownership of the property and who was operating it at the time of plaintiff's injury and at the time of the trial was not unduly limited, rather the contrary; and regardless of what these witnesses told the sheriff, that officer did not have to believe them, and apparently he did not err in attaching the circus as the property of the Sells-Floto Shows Company, for that attachment very speedily brought this defendant into court, not specially but generally, and in its behalf a bond was given to pay any judgment entered against this defendant (Civ. Code, § 201) which was a vastly different thing from a forthcoming or redelivery bond such as provided in section 200 of the civil code.

(*McKinney v. Purcell,* 28 Kan. 446.) A forthcoming bond would have served merely in lieu of the sheriff's physical custody of the property until the question of the propriety of the attachment could have been determined (*Tyler v. Stafford,* 24 Kan. 580, 582); but this bond to pay the judgment waived all question as to the legality of the attachment and discharged it. (*Washer v. Campbell,* 40 Kan. 398, 747, 19 Pac. 858, 21 Pac. 671; *Stow v. Shay,* 54 Kan. 574, 38 Pac. 784; 6 C. J., 327, 335-337; 2 R. C. L. 868.)

The evidence adduced in support of the motion for a new trial did not require that such motion be sustained.

Another error is urged because the trial court refused to set aside the special findings of the jury. This contention is merely a jury argument that the evidence did not show facts upon which these findings depended. It is fairly clear, and not disputed, that the defendant company owned the circus for a number of years and that its prestige was built up during that time. It is far from clear that the subsequent transfers of title were regular and complete. It is far from clear that the lease to the so-called Champion Shows Company was *bona fide.* It had many earmarks of being spurious. It is far from clear that the Continental Amusement Company was a regularly organized and independent corporation capable of giving an outright lease of the circus property, and more than doubtful that the property was ever vested or operated in recent years by anybody except the Sells-Floto Shows Company and Messrs. Bonfils & Tammen who owned that concern. The findings, being pertinent, and supported by substantial though much disputed testimony and conflicting evidence, were not improperly permitted to stand, and the overruling of the motion to set aside was not error.

A final complaint relates to the trial court's refusal to instruct the jury concerning the significance to be attached to the documentary evidence touching the corporate existence of the successive owners and lessors and lessees of the circus property. In view of the informal character of these concerns, and in view of the fact that some of the records of these alleged corporate transactions were not made at the time, and some of them were only recorded shortly before the trial, the rule that written records are better evidence than oral testimony was inapplicable. A very fair and pertinent instruction which the court did give sufficiently covered the main question in this lawsuit. It reads:

"15. You are instructed that, even though you find from the evidence that plaintiff, at the time of his injury, if any, worked for what was known as 'Sells Floto Circus,' yet before you can find for the plaintiff in this case, you must find from the preponderance of the evidence that the defendant, Sells-Floto Shows Company, was operating and in charge of the property that has been commonly referred to in this case as the Sells-Floto circus, and if you do not find from the preponderance of the evidence that the Sells-Floto Shows Company was in the actual operation of said property at the time plaintiff claims he was injured, then your verdict should be for the defendant."

The foregoing disposes of the principal points urged upon our attention. Other matters discussed in the briefs have had our patient attention. We discern no prejudicial error in the record; and certainly in view of the negligence of the defendant and its foreman in requiring the plaintiff, a boy of fourteen years, to sleep on a circus flat car with practically no side boards to keep him from rolling off the circus train as it travelled about the country, and in view of his serious and lasting injuries, the defendant was guilty of actionable negligence and there is no injustice in the net result.

Affirmed.