Stratton v. Atchison, T. & S. F. Rly. Co.

No. 25,785.

Ross STRATTON and M. F. JARVIS, Partners, doing business as the
UDALL MILLS, *Appellees*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

CARRIERS—*Reciprocal Demurrage Act—Delay in Furnishing Cars.* In an action
for statutory damages for delay in furnishing cars ordered by plaintiff for
the shipment of wheat, it is held: (*a*) that the evidence and the jury's
special finding disclose that the defendant did not have sufficient freight
cars to supply the demand; (*b*) that the order of the public utilities com-
mission governing the furnishing and distribution of cars was applicable;
(*c*) that one of plaintiff's orders for a car for the shipment of wheat suffi-
ciently conformed to the rule promulgated by the public utilities commission
governing the same; (*d*) that the evidence was sufficient to prove that at
the time the order was given plaintiff had a carload of wheat on hand at
the place where it was to be shipped; (*e*) that the car shortage was not
so acute as to excuse the long and discriminating delay to which plaintiff
was subjected; (*f*) and that plaintiff was entitled to recover on the count
based on defendant's unreasonable delay in filling the first order for a car.
But *held*, also, that the order for the second car failed to conform to the
pertinent rule of the public utilities commission and no recovery can be had
thereon.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed
June 6, 1925. Modified and affirmed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Alfred G. Arm-
strong,* all of Topeka, for the appellant.

*S. C. Bloss, George T. McNeish, Martin E. Jarvis,* and *Stewart S. Bloss,*
all of Winfield, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action for statutory damages for failure
and delay in furnishing cars for the shipment of wheat. The ac-
tion is founded on the reciprocal demurrage act (R. S. 66-201 *et
seq.*), and included in plaintiffs' demand was an item of $25 for
attorneys' fees in each of the two counts of the petition.

Plaintiffs' cause of action was set out in a bill of particulars and
filed before a justice of the peace. The defendant filed no pleadings.
When the case came to the district court on appeal no further
pleadings were filed, the cause being heard on the allegations of the
bill of particulars.

Plaintiffs alleged that in 1922 they were engaged in operating a mill and elevator on defendant's line of railroad at Udall, in Cowley county. On September 28, 1922, they placed a written order with defendant for a car for the immediate shipment of wheat to Winfield or Wichita, saying that the wheat was then in plaintiffs' elevator. This car was not furnished until November 4, 1922, thirty-six days after the order was given. On October 16, 1922, plaintiffs placed another written order with defendant for a car for the immediate shipment of wheat to Winfield or Wichita. This car was not furnished until November 25, 1922, forty days after the order was given. Plaintiffs demanded the statutory damages of $5 per day for each day's delay, less the reasonable time allowed for compliance, and deducting the intervening Sundays:

Count 1:
| | |
|---|---|
| 29 days' delay at $5.00 per day | $145.00 |
| Attorney's fee | 25.00 |
| | $170.00 |

Count 2:
| | |
|---|---|
| 26 days' delay at $5.00 per day | $130.00 |
| Attorney's fee | 25.00 |
| | $155.00 |

At the trial the facts above narrated were shown and not disputed. On behalf of plaintiffs there was testimony tending to show that other elevators on defendant's line of railway in Cowley county at distances of a few miles in three directions from Udall, to wit, at Rock, Kellogg and Winfield, much more prompt and expeditious service was rendered by defendant in the matter of furnishing cars for wheat shipments, one witness, who operated an elevator at Rock, testifying:

"Then we got our cars pretty promptly; they were pretty good to us. They aimed to keep me going and not have the elevator shut down. Once they gave me more cars than I ordered. Along the latter part of October I turned down a car."

A Winfield elevator man testified that cars on his orders were usually furnished with little delay; in one instance the delay was probably as great as one week.

An elevator man at Kellogg testified:

"Sometimes we had to wait a few days; sometimes in the neighborhood of ten days or two weeks. To the best of my knowledge, all those orders for the cars shipped in October were placed in October. We couldn't have waited over ten days or two weeks at the very longest. Sometimes I would get one within a couple of days after applying therefor."

On behalf of defendant it was shown that for the purpose of distributing its available supply of freight cars, the defendant's railway system is arranged in divisions, the divisions here concerned being the "middle division" and the "southern Kansas division"; that Winfield and Kellogg are in the southern Kansas division, and Rock and Udall in the middle division; that the defendant's available empty cars were distributed to the different divisions and parceled out by various officials in conformity with rules of the interstate commerce commission and of the public utilities commission. It was also shown that there was a shortage of available cars to supply the demand in the middle division in September, October and November, 1922, viz.:

|  | Cars available. | Cars demanded. |
|---|---|---|
| September | 708 | 1,735 |
| October | 337 | 1,871 |
| November | 780 | 1,962 |

Defendant's car distributor testified:

"We could not have furnished the cars at Udall within the time demanded without discriminating against other stations and shippers. When the cars get beyond the system of the company, the company has absolutely no control over those cars to have them returned. They simply have to wait until they return.

*Cross-examination:* "The system is allowed so many cars. That allotment is made to the general office at Topeka. The general manager divides them between the divisions; the division car distributor then divides them between the stations, and the station agent divides the cars allotted him between the shippers. The general manager divides the cars among the various divisions under instructions from the interstate commerce commission. The railroad is compelled to make a report to the interstate commerce commission of cars ordered and what cars are available. They arrive at a percentage basis from that report and divide the available cars accordingly to the different systems. When a certain number of cars are allotted to one division the general manager at Topeka cannot change the number and allot some of those cars to another division. You understand, the cars allotted are not all at the point where they are ordered and they have to be moved. For that reason we can't get them on the division. If one division has a great abundance of cars and another division has a lack of cars, we can't change the allotment. We haven't the authority. In such cases we would explain the circumstances to the original point of distribution, which would be the car service division of the interstate commerce commission. They would issue instructions according as they saw fit.

"Q. If there was an abundance here to supply Kellogg and these other stations, you could have gone around there and proceeded to get cars to supply the Udall mill? A. I couldn't, from the fact that I do not have any jurisdiction over Winfield and Kellogg.

"Q. Your company could? A. The man on the Southern Kansas division might have. . . .

*Redirect examination:* "There was a shortage of cars over all the system. We were able to supply only from eighteen to twenty-five per cent in the majority of places all over the system—over all the grain-loading territory, I mean. That was caused by the oncoming of harvest and threshing season and cars loaded for distant points were anywhere from fifteen days to three months being released. Winfield is the southern Kansas division point. If we are bringing cars in that have been returned to us and we would bring them past a station that needed cars, we would not have the power to drop them off there. When they are in trains we are supposed to take them through and place them to the station where they belong. The first available car for the first order."

Defendant also offered in evidence an order of the public utilities commission, dated September 1, 1920, and presumably promulgated so as to be effective thirty days thereafter, as the statute directs. (R. S. 66-205.) The order, in part, reads:

"In the Court of Industrial Relations, State of Kansas.

"In the matter of the hearing relative to conditions of grain car shortage for the purpose of promulgating such specific orders, rules and regulations for furnishing available cars to shippers on order at stations in Kansas as will be just and equitable. . . .

"It is therefore by the court considered and ordered:

"That the following rules are hereby found to be reasonable and are established for the distribution of available grain cars:

"1. It is the duty of each and every railroad company operating within the state of Kansas to furnish to any shipper who *bona fide* makes legal demand therefor, at the time and at the station demanded by such shipper, such number and type of freight cars as the shipper may request for the shipment of grain. To this end the railroad company or companies should make every reasonable possible effort to supply all their customers with all such cars as and when demanded and requested.

"2. Each shipper of grain shall make written order on the carrier's agent for the cars wanted for grain loading, showing the following information:

"(a) Date of order.

"(b) Number and kind of cars wanted.

"(c) Destination.

"(d) Date wanted to load.

"(e) Quantity of each kind of grain on hand and conveniently located for prompt loading tendered for rail shipment.

"(f) Name of shipper.

"Copies of orders by a shipper located on more than one carrier shall be filed with the agent of each carrier. Such combined orders must not exceed the total grain conveniently located for prompt loading tendered for shipment.

"3. Cars shall not be furnished in excess of a carrier's [shipper's] ability to load and ship promptly. . . .

Stratton v. Atchison, T. & S. F. Rly. Co.

"6. In case of the inability of any railroad company or companies to supply all such shippers at any shipping point, making legal demand therefor, with the number of grain cars demanded, in accordance with the provisions of the statutes of Kansas, all cars available for grain shall be distributed in such manner as, if possible, to keep all the elevators demanding cars open and operating, so as to enable all competitive purchasers in any community to participate in the buying of grain.

"7. In case it is impossible for any such railroad company to furnish sufficient grain cars at any shipping station to keep all the elevators open and operating, then and in that case all available grain cars shall be divided and distributed among such elevators and shippers, car and car about."

The jury returned a verdict in favor of plaintiff for $300, and answered certain special questions:

"SPECIAL FINDINGS OF FACT.

"Second. Were the grain cars in the A. T. & S. F. Ry. system fairly distributed to the several divisions comprising said system at the time of plaintiff's demands for cars? Ans. No.

"Third: If you answer the preceding question or either of them in the negative, state wherein the distribution of such cars was unfair. Ans. By filling orders at other points.

"Fourth: If you find that there was unjust distribution of grain cars, or that the plaintiff was unlawfully discriminated against, state wherein such discrimination was, and at what points they were made. Ans. At Rock, Kellogg and Winfield, Kan.

"Seventh: Did the defendant have sufficient cars to meet the requests of all of the grain shippers within its system at the time plaintiff made his demands? Ans. We do not know.

"Eighth: If you find that defendant was at fault in not furnishing cars to meet plaintiff's demands, state specifically in what such fault consisted. Ans. By unjust distribution.

"Ninth: Do you find that defendant could have furnished the cars demanded by plaintiff, sooner? Ans. Yes.

"Tenth: If you answer the preceding question 'yes,' state how defendant could have done so? Ans. By fair distribution."

Judgment was entered accordingly and defendant appeals.

The railway company calls attention to the pertinent provisions of statute, R. S. 66-201 *et seq.* By the first of these it is made the duty of every railway carrier to supply a shipper's demand for freight cars within a reasonable time, not exceeding six days after receiving orders therefor, and where the order is for ten cars or less, such cars shall be furnished within three days. Whenever the public utilities commission shall find that an emergency exists in the transportation of any commodity it may so declare, in which case the commission is authorized to specify what is a reasonable time in

which to furnish cars, and the railway carrier must conform thereto. It is also provided that where the carrier is prevented by accidental and unavoidable cause which by reasonable diligence it could not have foreseen and avoided, and where it supplies or offers to supply the cars within a reasonable time thereafter, the statutory damages allowed by the act shall not be imposed.

R. S. 66-202 provides:

"Said application for cars shall state the number of cars desired, the place at which they are desired, and the time they are desired: *Provided,* That the place designated shall be at some station or public switch on the line of its road."

R. S. 66-203, in part, provides:

"When the cars are applied for under the provisions of this chapter, if they are not furnished, the railway company so failing to furnish them shall pay to the party or parties so applying for them the sum of five dollars per day for each car failed to be furnished, as exemplary damages, to be recovered in any court of competent jurisdiction, and all actual damages that such applicant may sustain for each car failed to be furnished, together with reasonable attorney fees, to be recovered in any court of competent jurisdiction."

R. S. 66-205, reads:

"That the public utilities commission is hereby given full power and authority, and it is made its duty, after having given reasonable notice, and upon hearing had, to make, publish and enforce from time to time such general rules and regulations as are just and equitable relative to the distribution of grain cars in all cases in which any railroad company or companies are unable to furnish a sufficient number of grain cars at any station or stations, along its or their lines of railroad in Kansas, to receive and transport grain with reasonable dispatch; such rules and regulations shall become effective thirty days after the publication thereof and shall be published and furnished to any shipper upon application: *Provided,* That said commission may, upon application of any of the parties in interest, or upon its own initiative, investigate the conditions in any particular case of grain-car shortage, and upon a hearing had after not less than five days' written notice to said parties, or upon their written waiver of such notice, shall prescribe and enforce such specific orders, rules and regulations relative to the proper distribution of grain cars in any such case as in the judgment of the commission shall be equitable. Such specific orders, rules and regulations shall be in full force and effect from and after the making thereof, with notice to the parties in interest."

R. S. 66-207, in part, reads:

"That all the powers, rights and remedies provided by law for the enforcement of orders of the commission shall be applicable to the rules promulgated in accordance with the provisions of this act."

R. S. 66-209, reads:

"It shall be necessary for the party or parties bringing suit against any railroad company under the provisions of this law to show by evidence that he or they had on hand at the time any demand for cars was made the amount of grain or other freight necessary to load the cars so ordered."

The lawful orders of the public utilities commission have the force of statutes. In effect, they are administrative details of the statutes, prepared and promulgated under statutory authority. (*The State v. Railway Co.*, 76 Kan. 467, 92 Pac. 606.) See, also, R. S. 66-115, 116, 138, 139, 140, and citations in *The State v. Crawford*, 104 Kan. 141, 143, 177 Pac. 360.

The order of the public utilities commission was applicable to the service complained of if the defendant was suffering from a shortage of cars, and the testimony of its car distributor—if believed by the jury, and the jury had no right to capriciously discredit it—tended to establish that fact. Moreover, the fact that the public utilities commission had made a general order touching the distribution of freight cars in times of shortage, and that the carrier's alleged delinquency occurred in the late autumn when much wheat is moving and when a car shortage is common, were evidential incidents to be considered. So the jury's answer to the seventh special question, "We do not know," was not quite frank, but it will serve as a reluctant finding that defendant did not have sufficient cars, since a jury's finding, "We do not know," means "No." (*Wall v. Traction Co.*, 108 Kan. 531, 196 Pac. 434; *Toelle v. Sells-Floto Shows Co.*, 111 Kan. 562, 569, 207 Pac. 849.)

In neither of plaintiff's demands for cars was there a strict compliance with the rule promulgated by the public utilities commission that the shipper's order for a car should state the quantity of grain on hand and conveniently located for prompt loading. Defendant argues that since the consequence attaching to its delay in furnishing the cars is penal in its nature, the rule should be construed strictly. The general contention is sound enough, but it seems to us that in plaintiff's first order, at least, there was substantial compliance. The communication as a whole, fairly construed, meant that plaintiff had enough wheat in its elevator at Udall to fill the car ordered. The order read:

"Udall, Kansas, September 28, 1922.

*"P. R. McKinney, Agent, Udall, Kansas.*

"Dear Sir—This is our application for empty box cars suitable for immedi-

ate loading of wheat to Winfield or Wichita, Kansas, of the capacity of about 60 to 80 thousand pounds.

"Would surely appreciate the setting of this car on or before the 30th inst., account of having wheat sale expiring on that date.

"The wheat is now in our elevator.

> "Yours truly,      THE UDALL MILLS.
>
> "By Ross STRATTON."

We cannot say as much for the second order. The court must be shown a statement of some sort touching the quantity and location of grain to be shipped before it can expand it by liberal interpretation into a compliance with the rule of the public utilities commission. We cannot make something out of nothing. The second order read:

> "UDALL, KANSAS, Oct. 16, 1922.

"P. R. McKinney, Agt., Udall, Kansas.

"DEAR SIR—We wish to place án order for any capacity car for wheat loading, to be set immediately, to be shipped to Winfield, Ks., or Wichita, Kansas.

> "Yours truly,      THE UDALL MILLS."

Defendant contends that there was also a shortage of evidence to show that plaintiff had on hand the amount of wheat necessary to fill the cars at the times they were ordered. We think there was sufficient evidence to prove the fact so far as pertains to the first order. Ross Stratton testified:

"In the latter part of September, 1922, I made application for grain cars to be located at Udall for the immediate shipment of grain.

"Q. Did you at that time have grain on hand in your elevator? A. Yes, sir."

But for the defect in the second order, the testimony of the same witness would also supply this statutory requisite touching the second count:

"About October 16, 1922, I placed another application for a car with the agent at Udall. At the time of this application I had wheat on hand."

This case was not well tried below, through no fault of the trial court, but for want of adequate pleadings and a well-defined joinder of issues. From defendant's brief we infer that because of the chronic car shortage and the rules of the public utilities commission governing such conditions, the defendant's theory was that it is not liable for its prolonged and apparently culpable delay. The appellee, on the other hand, seeks to justify the judgment in toto, on the assumption that the defendant had sufficient cars to meet all demands in the season of heavy wheat shipments. Of course such was

not the fact, as the jury's seventh finding, properly construed, discloses. The appellee also suggests that the order of the public utilities commission never became effective. This is another point which could never have arisen if the issues had been properly joined. But as the statutes repeatedly declare that unless otherwise directed the orders of the commission are to become effective thirty days after they are issued, the presumption is that the order was promulgated in due course. In a pinch this court would hesitate to decline to take judicial notice of matters of such widespread public importance as the orders of the public utilities commission and the interstate commerce commission concerning the interminable freight-car shortage of recent years and relating to the distribution of freight cars for grain shipments in and out of this state.

But in our view of this case, although the orders of the public utilities commission were applicable, the car shortage did not excuse the unreasonable delay of thirty-six days in filling the order of September 28. Other shippers in near-by towns were served with no such dilatoriness. We think the plaintiff rightly prevailed on the first count. As to the second, we are constrained to hold that a total want of compliance with the rule requiring the shipper to state the quantity of wheat on hand and conveniently located for prompt shipment at the time plaintiff gave its order of October 16 defeats a recovery on the second count.

We note an item of twenty-five dollars for attorneys' fees which was sued for and apparently allowed without question in the trial court, and no error is assigned or argued concerning it. This court on its own motion will not meddle with the item, notwithstanding what was said in *Grain Co. v. Railway Co.*, 105 Kan. 272, 182 Pac. 405, and controlling cases considered therein.

The judgment of the district court will have to be reduced to $170, being the amount prayed for under the first count, and thus modified it will be affirmed.