No. 41,807

The Walt Keeler Company, Inc., a Corporation, *Appellee*, v. The Atchison, Topeka and Santa Fe Railway Company, a Corporation, *Appellant.*

(354 P. 2d 868)

Opinion filed July 22, 1960.

W. E. *Treadway*, of Topeka, argued the cause, and C. J. *Putt* and J. B. *Reeves*, both of Topeka, were with him on the briefs for the appellant.

J. *Francis Hesse*, of Wichita, argued the cause, and *Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, James W. Sargent, Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkel, John W. Brimer*, and *Harry L. Hobson*, all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: The Keeler Company sued the Santa Fe Railroad to recover back $34,194.80 claimed to have been overpaid between 1951 and 1955 under charges for car rental prescribed in the railroad's tariff circular on record with the state corporation commission.

The trial court entered a general judgment in Keeler's favor, the railroad filed a motion for new trial, which was overruled, and the railroad appealed from the trial court's judgment of $34,194.80 in favor of Keeler.

Keeler invokes the rule that this court will not disturb the findings of fact of a trial court when supported by substantial competent evidence even though it may be contradicted. However, the controlling facts in this case were based on stipulations and documentary evidence and therefore this court has as good an opportunity, and may examine and consider that evidence, as did the trial court. For a similar situation, see *Alumbaugh v. Hedges,* 125 Kan. 449, 456, 265 Pac. 50, 2 West's Kansas Digest, Appeal and Error, §§ 841, 842(8), and 845(2); 1 Hatcher's Kansas Digest, rev. ed., Appeal and Error, § 497.

The $34,194.80 sought to be recovered back by Keeler was the correct charge for the number of cars furnished by the railroad over the five-year period of time involved if the particular portion of the tariffs covering car rental charges were proper to be considered together and in connection with the tariff covering the switching movement of such leased cars.

A stipulated fact was that the railroad cars rented by Keeler were to be used to haul sand from pits where it was produced about four miles to Keeler's concrete processing plant. Under uniform straight bills of lading the cars were used and shipped over the railroad's line exclusively in Sedgwick county so that the shipments were classified as intrastate commerce.

Along with the payment of the car rental charges, Keeler paid the switching charges with which there is no quarrel but the point of contention is that because of one item in the switching rules and charges of the tariffs, the railroad made an illegal charge for the cars rented by Keeler.

Reflected in the record were tariffs 7641-X, 7641-Y, and 7641-Z, to be referred to hereafter by number, which governed local freight tariffs and were entitled:

"SWITCHING RULES AND CHARGES
"Also
"Absorptions of Switching Charges. . . ."

No. 7641-X was effective May 25, 1946, 7641-Y was effective and cancelled 7641-X on April 25, 1951, and 7641-Z was effective and cancelled 7641-Y on November 30, 1955. A supplement to 7641-Z became effective on March 20, 1956. Circular series No. 2074-Y effective March 15, 1946, named the car rental charges and notwithstanding a statement that appeared on the face thereof to the effect that circular 2074-W would apply to Kansas intrastate traffic,

2074-Y controls because of a state corporation commission order of August 28, 1946.

It is undisputed that 7641-Y controlled almost all the transactions in regard to switching that are here involved. Keeler maintains that while 7641-Y refers to other publications including 2074-Y, it makes the car rental charge under the latter unassessable by the railroad because of the very item of reference itself:

"ITEM 10.—CAR RENTAL CHARGES, REFERENCE TO.

"For Car Rental charges at stations in Colorado, @*Kansas,* Nebraska or New Mexico (except west of Albuquerque or Belen, N. M.), see 'Santa Fe' Circular No. 2074-Series; at stations in Oklahoma see Item 6880." (Our emphasis.)

At the bottom of the same page this footnote appeared:

"@Interstate traffic only."

To be more specific, the remaining transactions were controlled first by 7641-X which was identical to Y, and 7641-Z controlled the last ones, which did not have the same footnote, but had one referring the reader to page 81 where again appeared "@Interstate traffic only." Finally, the supplement to 7641 changed the "@" to a solid triangle, which conveys a different interpretation and does not need to be discussed herein.

Keeler further argues that the railroad by charging and collecting car rental in addition to the switching charges under the 7641 series, has made an illegal charge under its tariffs filed with the state corporation commission and that this was admitted on the part of the railroad by reason of the change in the supplement after this case was filed and cites, among others, *Howard v. Osage City,* 89 Kan. 205, 208, 132 Pac. 187; *White v. Cloak & Suit Co.,* 106 Kan. 239, 242, 187 Pac. 670.

A careful reading of the above authorities, and citations therein contained, indicates they merely stated that while such evidence showing changes shortly after the occurrence upon which a cause of action was based is admissible during the trial, it will not justify a jury instruction or rendition of a judgment thereon.

Keeler further contends that if the 7641 series does not clearly exclude any application of the circular 2074 series, then considering them together creates an ambiguity, and relies on *Union Wire Rope Corporation v. Atchison, T. & S. F. Ry. Co.,* 66 F. 2d 965 (cert. denied 290 U. S. 686, 78 L. Ed. 591, 54 S. Ct. 122) which involved interpretation of the meaning of the words "reworking or assem-

bling," "manufacture," and "fabrication" as a determining factor in fixing a through, or local, rate of tariff. The discussion is interesting but not material here. This rule therefrom relied on by Keeler is applicable to any tariff question.

"Tariff being written by carrier, all ambiguities or reasonable doubt as to its meaning must be resolved against carrier." (Syl. ¶ 3.)

Commenting further in the opinion, the circuit court of appeals stated:

"The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed. . . . This rule works out justice. Always the carrier can avoid such words or it can make clear the meaning it intends them to have. On the other hand, the shipper would naturally and reasonably understand the words in their customary meaning, and to hold him to something else after he had become obligated through reliance thereon would result in deception and loss caused by the carrier to its advantage." (p. 967.)

We cannot agree with Keeler's contentions of exclusion or ambiguity for the reason that, as mentioned above, on August 28, 1946, by order of the state corporation commission the railroad was authorized and directed to cancel its car rental circular 2074-W *applicable only to Kansas intrastate traffic* and apply in lieu thereof 2074-Y. This order of the commission modified and changed the rates and tariffs of the railroad and thereafter controlled any transactions between the shipper and the railroad. All the car rental payments sought to be recovered back by Keeler were paid subsequent to that date on the 5,865 rental cars.

The railroad sets out the pertinent statutes which are, and in effect provide, that G. S. 1949, 66-101 grants the state corporation commission supervision and control over common carriers in Kansas; 66-107 requires every common carrier to establish rates and make regulations; 66-109 forbids the charge, demand, collection, or receipt of greater or less compensation for certain services than is specified in the printed schedules or classifications; 66-110 provides the commission shall have power to fix or substitute rates, rules, and regulations as shall be just and reasonable; 66-146 states the commission has the power and duty to supervise all railroad freight schedules, rates, tariff and classifications; 66-154 makes it unlawful for any railroad to grant or enter into any arrangement whereby any consignee or consignor directly or indirectly shall receive a lower freight rate than that fixed by the commission or the

railroad's published schedules, or to grant any special privileges either in the way of preference in furnishing cars or any other form; and 66-171 forbids the railroad to charge any one person for transportation of any property a greater or less sum than it shall at the same time charge someone else for a like service from the same place, upon like conditions and under similar circumstances.

The railroad calls attention to the very persuasive decision of *Great Northern Ry. v. Delmar Co.*, 283 U. S. 686, 690, 75 L. Ed. 1349, 51 S. Ct. 579, wherein a grain shipper could ship a shorter route through Willmar to Superior, or use a longer route by originally billing to Minneapolis, and then reconsigning to Superior. This latter gave access to an additional grain market, was 12 to 23% longer, and involved switching through the large and busy railroad yards at Minneapolis. The shipper chose the longer route and the railroad made an additional charge under an option set out in the opinion. The Supreme Court, in reversing a judgment in favor of the shipper, said:

"In this situation we think the tariff should be construed as applying only to the shorter route, and not as giving the shipper the option between the two routes at the through rate. This conclusion is in accord with the principle that where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law." (pp. 690, 691.)

We cannot presume that the car rental agreement is illegal (*Kipp v. Goffe & Carkener,* 144 Kan. 95, 105, 58 P. 2d 102), but that it is legal (*Okerberg v. Crable,* 185 Kan. 211, Syl. ¶ 2, 341 P. 2d 966.) Reasonable rather than unreasonable interpretations are favored by the law, and results which vitiate the purpose of a written instrument or reduce its terms to an absurdity should be avoided. (*Geier v. Eagle-Cherokee Coal Mining Co.,* 181 Kan. 567, Syl. ¶ 4, 313 P. 2d 731.)

What has been said when applied to this case brings us to but one conclusion, and that is the trial court erred as a matter of law in entering judgment for Keeler.

We reach this conclusion because Keeler admits that if he had just rented the cars from the railroad, he would have been charged car rental, or if he had owned the cars and the only relation the railroad had to them was to switch them back and forth between his sandpit and the plant, then he would have been chargeable for the switching, but that since the railroad rented him the cars

and also switched them for him, the tariff charges cut off the car rental charges because of item 10 and the footnote. If we were to stop at that point, such reasoning is neither legal nor reasonable. What has this one isolated reference, coupled with the footnote, to do with the actual law applicable to rates, charges, tariffs, etc.? The statute and orders of the corporation commission have "pre-empted the field" on that subject so that item 10 and the footnote are no more than surplusage. Series 7641 and the circular 2074 series, under the present statutes and the commission's order of August 28, 1946, must be considered together, and the shipper here cannot choose any more than the grain shipper could choose in the Great Northern Railway case, *supra,* unless the court overrules the universal rule, above stated, and creates an illegal contract so that the common carrier would be in violation of G. S. 1949, 66-171.

The agreed facts and documentary evidence compel us to hold that under the order of the commission dated August 28, 1946, whereby the railroad was ordered to make car rental charges on Kansas intrastate traffic according to the provisions of its circular 2074-Y, the car rental charges were legal and required, and Keeler could not recover back the $34,194.80.

Reversed.