No. 43,394

Missouri-Kansas-Texas Railroad Company, a Corporation, *Appellant*, v. Standard Industries, Inc., a Delaware Corporation, *Appellee*.

(388 P. 2d 632)

Opinion filed January 25, 1964.

*John B. Markham* and *Elmer W. Columbia*, both of Parsons, argued the cause, and *Herman W. Smith, Jr.*, of Parsons, and *Lloyd Jones*, of Denison, Texas, were with them on the briefs for the appellant.

*Jack L. Goodrich*, of Parsons, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

Parker, C. J.: This is an appeal from a judgment sustaining a demurrer to the first amended petition, hereinafter referred to as the petition, which sought to recover demurrage charges for delay in unloading freight cars. The issue presented for determination is the specific nature of the action, which will determine the particular provision of the statute of limitations governing the time in which the action must be commenced.

The facts governing the question to be determined must be gleaned from the petition.

After identifying the plaintiff as a common carrier by railroad, engaged in the transportation of property for hire in interstate and intrastate commerce, and the defendant as a Delaware corporation authorized to do business in the state of Kansas, the petition alleges:

"In the transportation and handling of property in intrastate commerce between points within the State of Kansas, plaintiff, and the public, including the defendant herein, are governed by the laws of the State of Kansas and the rules and regulations of the State Corporation Commission of the State of Kansas, made pursuant thereto, to-wit: Chapter 66, Article 1, G. S. K. 1949,

as construed by the Supreme Court of Kansas in State vs. AT & SF Ry. Co., 117 Kan. 86, 230 Pac. 333, and other decisions which laws, among other provisions, require all railroads to file with the State Corporation Commission copies of all schedules of rates and charges for the transportation of property, and demurrage and storage charges, . . .

"Pursuant to said laws and the rules and regulations of said Commission this plaintiff, during all of the times herein mentioned, had filed with said Commission schedules of demurrage charges hereinafter mentioned, which had been approved by said Commission and were and are binding upon the parties hereto, one of which such tariffs was designated Freight Tariff 4-D Naming Car Demurrage Rules and Charges, which governed the assessment of demurrage charges on shipments made in intrastate commerce in Kansas, including the demurrage charges sued for herein."

Further allegations of the petition disclose that during the months of January and February, 1960, the plaintiff delivered to the defendant at Blum, Kansas, seventeen freight cars containing shipments of cement; that the shipments had been consigned to the defendant by the Universal Atlas Cement Company, Independence, Kansas, and had moved in intrastate commerce from point of orgin to destination; that the first of the cars in controversy was received by defendant January 5, 1960, and was released to plaintiff January 26, 1960; and that the next day the plaintiff delivered to defendant an instrument designated "DEMURRAGE BILL."

This demurrage bill, which was attached to and made a part of the petition, contained detailed information. It stated in large letters, *"FOR DEMURRAGE CHARGES AT RATES AS PER PUBLISHED TARIFFS."* It gave the car initial, number, date of arrival, date notice given, date ordered, date actually placed, and date released. Under remarks it also contained the following statement:

"CAR DETAINED 20 DAYS. 1 DAY ALLOWED ACCOUNT RAIN. 2 FREE DAYS. 4 DAYS CHARGEABLE AT 4.00 PER DAY. 13 DAYS AT 8.00 PER DAY."

Similar demurrage bills, also attached to and made a part of the petition, were delivered to defendant following the release of the other sixteen cars. The last car in controversy was delivered to defendant February 13, 1960, and released to plaintiff March 26, 1960. The fifteen cars, not specifically referred to herein, were held from eighteen to forty-four demurrage days.

When examined in its entirety the petition further reveals that the failure of defendant to unload and release the cars resulted in the accrual and assessment of demurrage charges, under the tariff filed with the Commission, in the amount of $3,744.00.

Plaintiff filed the action on February 8, 1962. Summons was served on February 16, 1962. Defendant's demurrer to the original petition was sustained by the trial court on June 30, 1962, without stating the grounds for that ruling. Thereupon, and on July 18, 1962, plaintiff filed its amended petition. Subsequently defendant lodged a demurrer against such pleading. It reads:

"Comes now the defendant and generally demurs to plaintiff's first amended petition and the exhibits thereto attached on the ground and for the reason that said petition and exhibits do not state facts sufficient to state a cause of action against defendant; and specifically on the ground and for the reason that said petition and exhibits or a part thereof show on their face that they are barred by the statute of limitations, G. S. 1949, 60-306 subsection Third and Fourth."

The lower court entered its judgment sustaining the foregoing demurrer and again did not state the grounds on which the demurrer was sustained. Plaintiff then appealed from such ruling.

At the outset, it may be stated, it appears from the briefs of the parties and arguments of their respective counsel that only the question of the statute of limitations is involved on appellate review.

Appellant contends that its action is to collect freight demurrage charges under its contract with appellee according to its tariffs on file with the State Corporation Commission, that such action is *ex contractu* in nature and is therefore governed by the three-year statute of limitations (G. S. 1949, 60-306, *Second*).

Appellee contends that an action to recover demurrage charges is for the recovery of a penalty or forfeiture and the one-year statute of limitations (60-306, *Fourth*) applies, but if not it is an action for taking or detaining personal property and the two-year statute of limitations (G. S. 1949, 60-306, *Third*) applies. It attempts to support this contention by suggesting that G. S. 1949, 66-211 and 66-212, providing for reciprocal demurrage, have been construed by this court as penal in nature. Appellant counters by pointing out that the reciprocal demurrage statutes have been superseded by G. S. 1949, 66-101, *et seq.*, which gave the State Corporation Commission supervisory jurisdiction over the rates and charges of common carriers.

We agree with the contention of the appellant that an action to recover demurrage charges under the existing statutes is *ex contractu* in nature.

Appellee calls our attention to the reciprocal demurrage statutes (see G. S. 1949, 66-201 to 66-204, incl., also 66-211 and 66-212) and insists that this court has construed such statutes to be penal in nature. This is true so far as the amount of the recovery, under those sections of the statute, is concerned. See *Milling Co. v. Railway Co.*, 82 Kan. 256, 108 Pac. 137.

A penalty is a statutory liability imposed on a wrongdoer in an amount which is not limited to the damages suffered by the party wronged. (70 C. J. S., Penalties, § 1a, p. 389.) Such was the nature of the penal provision of the reciprocal demurrage statutes fixing the amount of the recovery. However, the penal provisions of such statutes have been superseded by the public utility act.

The reciprocal demurrage statutes were enacted in 1905. At that time railroads were regulated by piecemeal legislation which was enforced by fines, penalties, and mandatory writs. In 1911 the legislature passed a comprehensive act (Laws 1911, Chapter 238) covering the regulation of public utilities and common carriers. The supervision and control of public utilities and common carriers was placed in a commission with full power, authority, and jurisdiction (G. S. 1949, 66-101). The existing laws relating to regulations of railroads were transferred to the Commission (G. S. 1949, 66-103). The act contains the further provision:

"The rights and remedies given by this act shall be construed as cumulative of all other laws in force in this state relating to common carriers and public utilities, and shall not repeal any other remedies or rights now existing in this state for the enforcement of the duties and obligations of public utilities and common carriers or the rights of the corporation commission to regulate and control the same except where inconsistent with the provisions of this act." (G. S. 1949, 66-140.)

The fact that the penalty provisions, in the form of exemplary damages, contained in the laws of 1905 covering reciprocal demurrage, are inconsistent with the provisions of the public utilities act of 1911 is readily demonstrated.

The public utility act requires every common carrier to establish joint and reasonable rates and charges (G. S. 1949, 66-107) and publish and file with the Commission copies of all schedules of rates and charges (G. S. 1949, 66-108). It prohibits any variations in the rates and charges from the schedule of rates and charges so filed and published (G. S. 1949, 66-109) and authorizes the Commission to investigate and establish just and reasonable rates and charges (G. S. 1949, 66-110).

The provisions of the 1905 act, specifically applicable to railroads but similar to those heretofore noted as applicable to common carriers, were carried over in the 1911 act (G. S. 1949, 66-146, *et seq.*) and demurrage and storage charges were specifically included (G. S. 1949, 66-149). The rates and charges, including demurrage, of common carriers were no longer enforced by fines, penalties, and writs of mandamus but were enforced by rules, regulations and orders of the Commission. A common carrier could not exact any rates or charges other than those included in its filed schedule without an order of approval of the Commission (G. S. 1949, 66-109 and 66-117).

The rules and orders of the Commission, promulgated under statutory authority, are administrative details of the statutes and have the same force and effect (*Stratton v. Atchison, T. & S. F. Rly. Co.*, 118 Kan. 673, 679, 236 Pac. 831).

It necessarily results that when demurrage charges are filed with the Commission and approved by it the demurrage schedule, as filed, has the force and effect of law and the carrier cannot deviate therefrom. Any attempt on the part of the carrier to collect more or less demurrage charges listed in the schedule filed would be discriminatory and in violation of G. S. 1949, 66-154 and 66-154a.

In *Keeler Co. v. Atchison, T. & S. F. Rly. Co.*, 187 Kan. 125, 354 P. 2d 368, this court, in discussing the effect of the Commission's order changing a rate schedule, said:

". . . This order of the Commission modified and changed the rates and tariffs of the railroad and thereafter controlled any transactions between the shipper and the railroad. . . ." (p. 128.)

The foregoing statements and conclusions find support in well recognized legal treatises. See 13 C. J. S., Carriers, § 335, where it is said:

". . . It becomes not only the right, but the absolute duty, of the carrier to collect or enforce the demurrage so fixed or provided for; and such right and duty cannot be avoided or affected by matters which might otherwise give rise to a waiver or estoppel.

"Ordinarily the demurrage charges may and must be reasonable in amount. However, under the Interstate Commerce Act and similar state statutes, the rate fixed in the filed and published tariff is conclusively presumed to be a reasonable one until proper action has been taken thereon by the commission." (p. 796.)

See, also, 13 C. J. S., Carriers, § 334, which reads:

"For most purposes demurrage charges are regarded as something apart and separate and distinct from the transportation charges as they do not arise, if at all, until the transportation is ended. Rather, they have been said to be more closely analogous to a 'storage' charge. As will be noted in the following section, however, it has often been held that for the purposes of the provisions of the Interstate Commerce Act, and similar state statutes, which regulate transportation rates and charges without express mention of demurrage charges, the latter are to be regarded as part and parcel of the transportation charges and subject to the same rules and regulations." (pp. 793, 794.)

For additional general statements of similar import see 9 Am. Jur., Carriers § 598, where the following statements appear:

". . . Although a few of the early cases, following the rule of the English courts as to admiralty demurrage, have denied the right to exact demurrage charges in the absence of contract, the weight of authority now clearly sustains the right of a railroad company to make a reasonable charge for the detention of its cars by shippers beyond a reasonable time in loading or unloading, or by reason of the failure to give shipping instructions, even in the absence of a stipulation therefor in the contract. This is on the theory that shippers and consignees impliedly contract to submit to all reasonable rules adopted by a railroad company for the regulation of shipments, and that rules or regulations providing for demurrage are not only manifestly promotive of justice to the carrier, but are also of the highest public importance, as only by their adoption and strict enforcement can promptness, uniformity, and safety in the railroad traffic business of the country be secured. . . ." (p. 782.)

The nature and purpose of a demurrage charge is well stated in *Turner Lumber Co. v. C., M. & St. P. Ry.*, 271 U. S. 259, 70 L. Ed. 934, 46 S. Ct. 530, where it is said:

"The efficient use of freight cars is an essential of an adequate transportation system. To secure it, broad powers are conferred upon the Commission. [citing cases]. One cause of undue detention is lack of promptness in loading at the point of origin or in unloading at the point of destination. Another cause is diversion of the car from its primary use as an instrument of transportation by employing it as a place of storage, either at destination or at reconsignment points, for a longer period while seeking a market for the goods stored therein. To permit a shipper so to use freight cars is obviously beyond the ordinary duties of a carrier. The right to assess charges for undue detention existed at common law. Now, they are subject, like other freight charges, to regulation by the Commission. Demurrage charges are thus published as a part of the tariffs filed pursuant to the statutes.

"All demurrage charges have a double purpose. One is to secure compensation for the use of the car and of the track which it occupies. The other is to promote car efficiency by providing a deterrent against undue detention. . . ." (p. 262.)

The generally accepted rule is that an action to recover demurrage charges by virtue of a filed schedule is *ex contractu* in nature. See 13 C. J. S., Carriers, § 347, for the following statement:

"An action for the recovery of demurrage charges is ordinarily ex contractu in nature, and may be in the form of an action of assumpsit on the common counts." (p. 813.)

For well considered decisions, to which we adhere, where the above stated rule is recognized and applied see *Louisville & N. R. Co. v. Camody,* 203 Ala. 522, 84 So. 824, which reads:

"The term 'demurrage,' as applied to cases arising out of contracts of affreightment by rail, means the damages for the detention of cars to which a shipper or consignee of goods may become liable under an express or implied contract. The theory is that, in the absence of an express contract, the shipper or his consignee impliedly contract to submit to reasonable rules adopted by the carrier for the regulation of shipments; . . ." (p. 523.)

And see *Atchison, T. & S. F. Ry. Co. v. Johnson,* 99 Okla. 72, 225 Pac. 939, where, after quoting in the opinion from 4 R. C. L. 317, now 9 Am. Jur., Carriers, § 598, it is said:

"Under the tariffs, filed with and approved by the Corporation Commission, demurrage was chargeable on this shipment after 48 hours' free time exclusive of Sundays and legal holidays, computed from the first seven a. m. after notice to consignee of arrival of the shipment at its destination; and, under the rule above announced, the consignee, Bowers-Venus Grain Company, impliedly contracted to submit to this rule." (p. 73.)

In view of what has been heretofore stated and held we have little difficulty in concluding the involved action is *ex contractu* in nature and that the three-year statute of limitations (G. S. 1949, 60-306, *Second*) applies. It follows the demurrer to appellant's petition should have been overruled.

The judgment is reversed.

JACKSON, J., not participating.