**THE MARTIN BROTHERS BOX COMPANY, a corporation, Oakland, Oregon, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Defendants,**

Southern Pacific Company, a corporation, Intervenor.

Civ. No. 6239.

United States District Court,
D. Oregon.
May 15, 1953.

Irving Rand and Donald Schafer, Portland, Or., and George L. Quinn, Jr., of Washington, D. C., for Martin Bros. Box Co.

George L. Buland, James E. Lyons, and Charles W. Burkett, Jr., of San Francisco, Cal., and George B. Campbell, of Portland, Or., for Southern Pac. Co.

Edward M. Reidy, Chief Counsel, Interstate Commerce Commission, Washington, D. C., and William L. Harrison, of San Francisco, Cal., for Interstate Commerce Commission.

SOLOMON, District Judge.

Plaintiff, Martin Brothers Box Company, hereinafter sometimes called "complainant," filed a petition in this court pursuant to 28 U.S.C.A. § 1336 to set aside an order of the Interstate Commerce Commission, hereinafter called the "Commission," dismissing the complaint of the plaintiff in a proceeding brought before the Commission. The United States of America and the Commission have no financial interest in this case but, because of statutory necessity, 28 U.S.C.A. § 2322, they were made parties defendant. Southern Pacific Company, the defendant in the proceeding before the Commission and the intervenor herein, shall hereafter be referred to either as "Southern Pacific" or "defendant."

Plaintiff, by complaint filed against Southern Pacific with the Commission on October 14, 1947, alleged that Southern Pacific, during the period from January 1, 1947, to September 30, 1947, failed in its duty to provide and furnish transportation from plaintiff's plant at Oakland, Oregon, upon reasonable request there-

for, and failed in its duty to furnish safe and adequate car service at that plant in violation of § 1(4) and § 1(11) of the Interstate Commerce Act, hereinafter referred to as the "Act," 49 U.S.C.A. § 1(4) and § 1(11). By reason thereof, plaintiff alleged that it was caused undue and unreasonable prejudice and disadvantage in violation of § 3(1) of said Act. Plaintiff, under § 9 of the Act, requested an award of reparations in the sum of $2,259,000.

A hearing was had on such complaint before an Examiner in Portland, Oregon, and, on September 1, 1950, the Examiner filed his proposed report in which he found defendant had violated its duty to furnish plaintiff adequate car service and recommended an award of reparations in the amount of $135,220.56 with interest. Exceptions were filed by both plaintiff and Southern Pacific to such report and, following a hearing before its Division 3, the Commission, on March 12, 1951, rendered its decision in which it dismissed plaintiff's complaint. Martin Brothers Box Co. v. Southern Pacific, 280 I.C.C. 395.

A petition for reconsideration was denied by the full Commission on June 30, 1951.

Plaintiff, in its petition filed in this court on November 26, 1951, requested a hearing before a 3-judge court and the Southern Pacific, in addition to its general denial, raised the special defense that this court, under § 9 of the Act, lacks jurisdiction to review an order of the Commission denying reparations.

On the authority of United States v. Interstate Commerce Commission, 1949, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451, the request of plaintiff for a 3-judge court was denied and the special defense of the Southern Pacific was overruled.

There is no substantial dispute between the parties as to the scope of review by this court of the Commission's order. This court, according to United States v. Interstate Commerce Commission, 1951, 91 U.S.App.D.C. 178, 198 F.2d 958, 964, is

"to apply the standards of judicial review which are generally applicable to administrative action—the standards reflected in the Administrative Procedure Act, § 1 et seq. 5 U.S.C.A. § 1001 et seq., and in such decisions as Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 489, 62 S.Ct. 722, 86 L.Ed. 971; Gray v. Powell, 314 U.S. 402, 412, 62 S.Ct. 326, 86 L.Ed. 301; Rochester Telephone Corp. v. United States, 307 U.S. 125, 129, 59 S.Ct. 754, 83 L.Ed. 1147; and Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 68 L.Ed. 667."

In other words, this court is limited to determining whether there was a rational basis for the final order of the Commission and, unless the order is not supported by substantial evidence or is contrary to law, it may not be disturbed.

With this standard in mind, I desire to examine the findings of the Commission. A summary of the facts found by both the Examiner and the Commission follows:

On February 28, 1946, the plaintiff purchased a lumber mill located at Oakland, Oregon, from the A. K. Wilson Lumber Company, primarily to establish a plant for the manufacture of wirebound boxes as well as to supply lumber for its plant located at Toledo, Ohio.

Plaintiff planned to continue the operation of the lumber mill at Oakland and estimated that 5 or 6 cars would be needed each day for the shipment of lumber. This plant had previously been given an allotment of 5 cars a day by Southern Pacific on the basis of the former owner's requirements as a lumber mill. Plaintiff also planned to enlarge and improve the facilities and install machinery for the manufacture of wirebound boxes and to begin production of boxes, with one shift, about the middle of 1946. It was planned to add a second and, later, a third shift when trained personnel was available. For each shift in the wirebound box department, it

was estimated that from 3 to 4 cars would be needed each day for the shipment of boxes, or a total of approximately 13 cars a day.

Before purchasing the Oakland mill, an option thereon and an option on nearby standing timber were obtained. Before exercising its options, plaintiff discussed its plans with defendant's officers and made known its requirements. After receiving defendant's assurances that sufficient freight cars would be furnished to it, plaintiff exercised such options.

By August, 1946, the box-making machinery was installed. However, even earlier, plaintiff established a sales office in Los Angeles and, before any boxes were manufactured, these salesmen booked orders for about 200 carloads of boxes. Because of its inability to obtain sufficient box cars for shipments of lumber to Toledo, the salesmen were instructed to relax their sales efforts. By letters dated July 30 and August 6, 1946, the plaintiff advised the defendant's manager of perishable freight traffic and a district freight agent, both at San Francisco, of its desperate need for cars; that the immediate minimum requirements of the plant were 36 cars per week or 150 cars per month; and that the needs of the plant would shortly be increased to about 250 cars a month. At various times prior to and during the first 9 months of 1947, the plaintiff complained to the defendant that adequate cars were not being received and that additional cars were urgently needed not only to ship lumber to its Toledo plant but also to fill orders of producers of perishable commodities which, in turn, urgently needed the containers for shipment of their produce.

One of plaintiff's Los Angeles salesmen, who had been notified to stop taking further orders, came to Oregon, where he spent 1½ months in Oakland during the fall of 1946, and 3 months during the spring of 1947, during which time he exerted all his efforts to obtain more cars. He made telephone calls each morning before 7:45 a.m. to the office of the defendant's local freight agent at Roseburg, Oregon, and went over the switch list with defendant's employees to ascertain how many cars, if any, were to be spotted at the plaintiff's plant that day. On several occasions, on days when no cars were assigned, he induced such employees to reconsider and assign a car for the plaintiff's plant. He made trips to Medford, Oregon, and called on the defendant's division freight and passenger agent who agreed to do all he could to afford relief. Plaintiff's employee also called on the defendant's freight traffic manager at Portland and discussed the situation with him. In one discussion with that official, he was informed that the plaintiff's fixed freight car quota was only 5 cars a day, the same as that assigned to the former owner of the Oakland mill. He was later told that the quota would be changed to 10 cars a day, but that, because of the car shortage, there was doubt that the plaintiff could be given more than 50 percent of its quota.

The defendant maintained an agent at Oakland who was in daily contact with the plaintiff's plant and sometimes went there two or three times a day. In addition, one of plaintiff's employees generally visited defendant's office at Oakland both in the morning and afternoon of each day. While there, he often called the defendant's office at Eugene with respect to the assignment of cars. The defendant's agent at Oakland admitted that he knew plaintiff desired additional cars and that, in response to the latter's requests, he attempted to obtain them through various officials of the defendant.

Plaintiff had orders that were sufficient for operation of the Oakland plant at capacity during the complaint period. It usually operated only one shift. For short periods of time, the plaintiff was required to cease its operations. Plaintiff gave some of its orders to another manufacturer of boxes and a few orders were delivered by truck. Due to plaintiff's inability to fill orders when needed, many orders were canceled.

As a result of the inability to obtain lumber from Oakland, the operations of

the Toledo, Ohio, plant were curtailed. The Toledo plant was operated with two shifts until March 18, 1947, and with one shift thereafter. About 65 carloads of lumber a month were required to keep each shift running. Most of the lumber was purchased in the open market, but plaintiff was unable to purchase enough in the open market to satisfy the needs of the Toledo plant.

The cars shipped from Oakland to Toledo during the complaint period were as follows:

| | |
|---|---|
| January | 32 |
| February | 47 |
| March | 27 |
| April | 10 |
| May | 12 |
| June | 6 |
| July | 2 |
| August | 6 |
| September | None |

Including the cars shipped to Toledo, plaintiff received a total of 593 [1] cars during the complaint period.

The testimony of W. F. Forrest, "a person of considerable transportation experience," who was employed by plaintiff "to make a survey of the other shippers on the defendant's lines concerning their orders and deliveries during the period covered by the complaint," was reviewed. Mr. Forrest traveled 7,752 miles and interviewed the traffic personnel of many shippers at numerous points on the defendant's lines. "He claims to have found evidence of delay in filling car orders only at non-competitive points." He also made a study of defendant's records of plaintiff's written car orders for the whole complaint period and of six other shippers, three of whom were located in Eugene, two in Portland, and one in Salem, for the months of July, August and September, 1947. Solely on the basis of these written car orders, he found that plaintiff promptly received all of the cars which it ordered up to July 1, and that during the remaining three months, plaintiff, but not the other six shippers, encountered a considerable amount of delay in receiving cars.

Mr. Forrest further testified that Timber Structures, Inc., a large Portland lumber company, for whom he acted as traffic manager, "ordered its cars by phone and experienced no difficulty in obtaining cars from the defendant during 1947."

There was also introduced in evidence an

"excerpt from a transcript taken for this Commission on April 30, 1947, at a hearing on an application for a water carrier for additional operating authority. * * * The excerpt submitted consisted of testimony by a representative of the defendant who claimed that it was at that time experiencing no shortage of cars."

The defenses interposed by the defendant were described as follows:

"The defendant states that its ability to supply cars in 1947 was adversely affected by unusual, unavoidable and unforeseeable conditions resulting from World War II; that at all times during the complaint period it distributed cars to the complainant on a reasonable basis; and that during the complaint period it actually delivered to the complainant more cars than were specifically ordered."

With reference to the defendant's contention that it could not anticipate the unusual demand for cars that arose in

1. In this opinion, as in the Commission's opinion, the number of cars furnished was adjusted to reflect the regulations of a service order of the Commission which permitted the use of two or three refrigerator cars in place of one box car depending upon the size of the box car ordered. The 593 cars were delivered as follows:

| | |
|---|---|
| January | 98 |
| February | 78 |
| March | 87 |
| April | 40 |
| May | 54 |
| June | 63 |
| July | 62 |
| August | 58 |
| September | 58 |

1947, the Commission recited a number of facts on the basis of which it found:

"On these facts the defendant cannot be held accountable for general car shortages on its lines within the period covered by this complaint."

With reference to the defendant's next contention, the Commission stated:

"In support of its contention that cars were distributed to the complainant on a reasonable basis, the defendant showed that during the period concerned the complainant received more cars than it requested by written car orders, whereas other shippers on its lines, including the Portland division, were furnished on the average only 80 percent of the cars ordered by them. From January 1 to June 30, 1947, cars were furnished to the complainant in practically complete compliance with written car orders, and in the remainder of the period more cars than ordered were furnished, but some delay was encountered. In the latter period, the distribution of cars to shippers on the Portland division, including the complainant, was made on a percentage-of-quota basis; that is, if the available car supply on a particular day was only 50 percent of the aggregate capacity of the district, each shipper was assigned only 50 percent of its quota, except that no cars would be assigned to a shipper which had no orders on file. During the first six months of the complaint period, the car shortage was not as severe as during the later period; but some shortage did exist, and cars were allegedly distributed to each shipper in proportion to the number of empty cars available."

The Commission described the method by which the plaintiff gave orders for cars to the defendant's local agent at Oakland and then stated:

"Under normal conditions it is the practice for shippers to order the specific number of cars wanted, and therefore, the defendant insists that inasmuch as the complainant received more cars than were specifically ordered, it has no legitimate reason to complain that the distribution of cars made was other than reasonable. The complainant indicated generally that it wanted more cars than were furnished and this is admitted by the Oakland agent of the defendant. It appears that the written car order blanks, which were filled out and given to the defendant's agent after the complainant knew what cars had been assigned to it for the particular day, were to a large extent nothing more than a written confirmation, for the defendant's records, that the complainant wanted the cars that had been assigned to it for that day."

The Commission reviewed the evidence on the claim of the defendant that a number of cars were kept by plaintiff on its siding from 3 to 7 working days during the complaint period. This evidence was introduced to rebut plaintiff's contention that it was not furnished all the cars which it needed. The Commission concluded its discussion by stating:

"Under emergency conditions such as exist during a period of car shortage, a carrier may be justified in refusing cars to a shipper negligently withholding from shipment cars previously furnished to it. While there is no indication that the defendant's car service practices with respect to the complainant were affected by the holding referred to of cars by the complainant, such holding is relevant in a consideration of the complainant's ability to load cars in addition to those which were furnished."

The Commission then referred to the testimony of the defendant that plaintiff was not in competition with shippers at terminal points and that

"conditions and circumstances affecting the promptness of car supply at terminals are such as necessarily give shippers there located a natural advantage over shippers at nonterminal points."

This testimony was offered to rebut plaintiff's evidence that shippers at terminal points received better service.

Finally, the Commission reviewed plaintiff's evidence on its claim for damages against the defendant.

Under the heading, "Conclusion," the Commission stated:

"The evidence establishes that from January 1 to June 30, 1947, complainant received practically all of the cars for which specific written car orders were placed; that thereafter in the complaint period more cars were furnished than were requested by written orders, though some delays were experienced; that complainant desired, required, and attempted to secure additional cars from defendant; that defendant and its employees made reasonable, and sometimes successful, efforts to furnish additional cars to complainant; that by reason of its inability to secure cars at all times when needed complainant was unable to fill some orders placed with it; that during 1947 defendant suffered a daily shortage of 583 freight cars; that such shortage was a general one for which no direct responsibility can be placed upon defendant; and that it is not shown that defendant unduly favored shippers other than complainant.

"Complainant alleges violations of section 1(4), section 1(11) and section 3(1) of the Interstate Commerce Act. Under those sections defendant is required, in part, to provide and furnish transportation upon reasonable request; to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and not to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, locality, or territory. The right of a shipper to cars, however, is not an absolute right and the carrier is not liable if its failure to furnish cars was the result of sudden and great demands which it had no reason to aprehend would be made and which it could not reasonably have been expected to meet in full. The law exacts only what is reasonable from such carriers, but at the same time, requires that they should be equally reasonable in the treatment of their patrons. In case of car shortage occasioned by unexpected demands, they are bound to treat shippers fairly, if not identically. Pennsylvania R. Co. v. Puritan Coal Mining Co., 237 U.S. 121 [35 S.Ct. 484, 59 L.Ed. 867] and Midland Valley R. Co. v. Barkley, 276 U.S. 482 [48 S.Ct. 342, 72 L.Ed. 664]. Considering the above, in the light of the facts of this record, we conclude that complainant has failed to establish any violation of sections 1 and 3 as alleged. Moreover, the evidence presented falls far short of the requirements in a proceeding of this character to support an award of reparation. Where special damages are sought, the proof thereof must be as definite and certain as would be necessary under established principles of law to support a judgment in court. Lignum-Vitae Products Corp. v. Alabama G. S. R. Co., 268 I.C.C. 599, 608.

"We find that complainant has failed to establish that defendant during the complaint period engaged in any unreasonable or otherwise unlawful practice, as alleged, in violation of section 1 of the Act in furnishing or not furnishing cars to complainant at Oakland, Oreg., or that defendant subjected complainant to any undue prejudice in violation of section 3. The complaint will be dismissed."

Except for the findings of the Commission above quoted under the heading "Conclusions," the statement of the evidence and the findings of the Examiner were practically identical to those of the Commission. The Examiner recommended an award of reparations and

the Commission dismissed plaintiff's complaint.

I previously indicated that the court is charged with the duty of determining whether there is a rational basis for the Commission's conclusions. Or, stated differently, whether the Commission's conclusions are supported by substantial evidence, considering the whole record, and whether, in arriving at those conclusions, it correctly applied the applicable law.

■ In my opinion, the statement set forth in the second paragraph of the conclusions correctly set forth the rules of law relative to the distribution of cars by a railroad. A railroad, under § 1(4), § 1(11) and § 3(1) of the Act is required:

1. To furnish transportation upon reasonable request.

2. To establish and enforce reasonable rules with respect to car service.

3. To refrain from causing any undue influence or unreasonable preference or advantage to any particular person, company, locality, or territory.

4. To treat shippers fairly, if not identically, in case of a car shortage.

There remains the question of whether the other conclusions are supported by substantial evidence and are not contrary to law. I will consider each statement in the Commission's conclusions separately.

I. "The evidence establishes that, from January 1 to June 30, 1947, complainant received practically all of the cars for which specific written car orders were placed; that thereafter in the complaint period more cars were furnished than were requested by written orders, though some delays were experienced;"

This statement was based upon the testimony of W. F. Forrest, plaintiff's expert, whose testimony was admittedly based upon exhibit 8, which he prepared solely from the written car orders taken from the defendant's files. This statement is relevant only if plaintiff was required to show, as a condition precedent to its right to cars, that it either placed specific written car orders or specific oral car orders for the cars that it desired.

Defendant, in its brief and in one of its oral arguments, contended that plaintiff was required to place written car orders for the cars that it desired. However, in the final argument before this court, defendant abandoned such contention and admitted that neither the Act, the regulations of the Commission, nor the rules of the defendant, required written car orders. In my opinion, the abandonment of this contention was proper, particularly in view of the other findings of the Commission.

Although the Commission, in such statement referred solely to written car orders, it is relevant to determine whether plaintiff was required to place car orders for a particular number of cars, of a particular type, for delivery to plaintiff on specified days, before the Commission can find that the defendant failed to furnish freight cars upon the "reasonable request" of plaintiff.

The findings of the Commission, heretofore summarized, and the evidence upon which such findings are based, show the continuous requests of plaintiff to secure additional box cars to partially satisfy its urgent need for such cars.

In spite of defendant's knowledge of the needs of plaintiff and its almost daily requests for such cars, defendant contends that such requests do not meet the requirements of specificity demanded by the Act.

In support of this contention, defendant cites:

1. Victor-American Fuel Co. v. Denver & Salt Lake Railroad Co., 115 I.C.C. 169. (1926)

2. Winters v. Chicago-Milwaukee Railroad Co., 87 I.C.C. 113. (1923)

3. Di Giorgio Importing & Steamship Co. v. Pennsylvania Railroad Company, 1906, 104 Md. 693, 65 A. 425, 8 L.R.A., N.S., 108.

4. George H. Koepp, Inc., v. New Orleans Great Northern Railroad Co., 1926, 162 La. 487, 110 So. 729.

5. Simmons v. Seaboard Air Line Ry. Co., 1909, 133 Ga. 635, 66 S.E. 783.

6. 13 C.J.S. Carriers, § 37, page 74.

7. 90 American Jurisprudence 630.

The Victor-American and the Winters cases, both of which are Commission decisions, do not even remotely involve the problem before us.

In the Di Giorgio case, plaintiff, a shipper, brought an action against the railroad in the state court for breach of its common law duty to furnish cars. Plaintiff had ordered a specific number of refrigerator cars to ship four boatloads of bananas consigned to it from Jamaica and Cuba. The requisition designated the date of the arrival of the first ship, but did not designate the arrival date of the other three ships. The first ship and one other arrived on the same day and sufficient cars were supplied by the defendant. A few days later, two other ships arrived and the defendant failed to provide a sufficient number of cars to remove the entire cargo. The defendant proved that it had no notice from plaintiff or from any other source, of the approach or expected arrival of the two later ships and a judgment in favor of the defendant was therefore affirmed.

Both the Koepp and the Simmons cases were also actions in state courts under state laws. They involved specific written car orders, but in both cases the carrier was not informed, and had no knowledge, of the type or types of cars required by the shipper. The court in each case found that the shipper required different types of cars for the commodities it manufactured. In the case at bar, the Southern Pacific knew that plaintiff wanted box cars. In fact, Southern Pacific complained that plaintiff always wanted box cars, the type of freight car in greatest demand.

These three state court cases, as well as three other cases, are cited in the Corpus Juris Secundum reference to support the text which lays down the requirement of specificity as to the number and character of the cars desired and the time such cars are to be furnished. The other three cases are:

1. Weida v. Chicago, M. & St. P. Ry. Co., 1898, 72 Minn. 102, 75 N.W. 121.

2. Central of Georgia Ry. Co. v. Rabun, 1917, 21 Ga.App. 402, 94 S.E. 598.

3. Stratton v. Achison, Topeka & Santa Fe R. Co., 1925, 118 Kan. 673, 236 P. 831.

The Weida case involved an interpretation of written car orders placed by a shipper located on a narrow gauge track. He successfully contended that, in accordance with the usual practice, he was entitled to twice the number of cars ordered for the 14-mile trip over the narrow gauge road.

In the Rabun case, plaintiff relied on three written car orders. A judgment in favor of plaintiff was reversed because plaintiff was merely an agent for the shipper and the court held an agent was not entitled to recover a statutory penalty.

The Stratton case involved an action for statutory damages under a state law for the failure to furnish two cars. From a verdict in favor of the plaintiff, the railroad appealed because a state public utility commission regulation required that car orders be in writing and contain information as to the number and type of cars wanted and, in the case of a wheat shipper, the quantity of wheat on hand. Plaintiff, a wheat shipper, had failed to state the quantity of wheat on hand in its order for one of the cars and therefore the judgment of the trial court was reversed as to such car.

None of the cases upon which defendant relies support its contention that plaintiff's requests for cars were insufficient because of lack of specificity or that such requests were not reasonable requests within the meaning of the Act.

In my opinion, the portion of the Commission's conclusions relative to written car orders has no bearing on any issue

of this case and, if the Commission did premise its dismissal of plaintiff's complaint on this portion of its conclusions, then it is erroneous as being contrary to law.

II. "complainant desired, required, and attempted to secure additional cars from the defendant;"

The findings of the Commission heretofore summarized relative to the attempts of plaintiff to secure additional freight cars are supported by substantial evidence and form an adequate basis for this conclusion of the Commission.

III. "defendant and its employees made reasonable, and sometimes successful, efforts to furnish additional cars to complainant;"

The only evidence to support this conclusion is summarized in the findings of the Commission.

One of plaintiff's Los Angeles salesmen, who had been instructed to refrain from taking further orders, came to Oakland where:

"He spent 1½ months in Oakland during the fall of 1946 and 3 months during the spring of 1947, during which time he exerted all his efforts to obtaining more cars. He made daily telephone calls each morning before 7:45 a.m. to the office of the defendant's local freight agent at Roseburg, Oreg., and went over the switch list of the defendant's employees to ascertain how many cars, if any, were to be spotted at the complainant's plant that day. *On days when no cars were assigned, he on several occasions induced the defendant's employees to reconsider and assign a car for the complainant's plant.* (Emphasis added.)

This salesman was told that plaintiff's quota was only 5 cars a day, the same as they assigned to the former owner of the Oakland mill.

"He was later told that the quota would be changed to 10 cars a day, but that because of the car shortage there was doubt that the complain-ant could be given more than 50 percent of its quota. * * *

"The defendant's agent at Oakland admitted that he knew complainant desired additional cars and that in response to latter's requests, he attempted to obtain them for the complainant through various other officials of the defendant."

The other findings of the Commission summarized in this opinion relative to the requirements of the plaintiff, the number of cars which it received, its efforts to secure additional cars, and the number of cars which other shippers on the Portland Division received during the same period, show that there was no substantial evidence to support the Commission's conclusion that defendant "made reasonable and sometimes successful efforts to secure additional cars for the complainant." A "reasonable effort" implies conduct in accordance with the defendant's statutory duty not to prefer "any particular person, company, locality, or territory," and likewise its statutory duty in case of a car shortage "to treat shippers fairly, if not identically."

IV. "by reason of its inability to secure cars at all times when needed complainant was unable to fill some orders placed with it;"

The findings of the Commission and the evidence upon which such findings were based amply support this conclusion.

V. "during 1947 the defendant suffered a daily shortage of 583 freight cars; that such shortage was a general one for which no direct responsibility can be placed upon the defendant;"

Here again, the findings of the Commission and the evidence upon which they were based amply support this conclusion.

However, it should be noted that the car shortage was not uniform throughout the entire complaint period. During the months of January and May, and during the first part of June, there was little, if any, shortage of box cars on the Portland Division. During the balance

of the period, there were car shortages which varied in intensity. In August and September, the car shortage was most severe.

VI. "it is not shown that the defendant unduly favored shippers other than complainant."

The Commission found that other shippers on the Portland Division during the complaint period were furnished on an average of 80[2] percent of the cars ordered by them. This includes the period beginning July 1, 1947, to September 30, 1947, when the car shortage was more severe and during which period the Southern Pacific adopted and placed in effect a car distribution rule based upon the "production capacity" of its shippers. It is contended that such rule operated to give each shipper its proportionate share of the total cars available.

The witness for defendant who explained the operation of the rule qualified it by stating, "We would take into consideration the car orders that were filed by the mill."

I have previously held that the written car orders placed by plaintiff with the defendant were no indication of the number of cars required, needed, or requested by the plaintiff and that the plaintiff made reasonable requests within the meaning of the Act for all of the freight cars which it required.

The Commission found that, during the complaint period, plaintiff had orders for and could have operated at capacity except for the lack of freight cars; that the plaintiff required 13 freight cars a day to operate at capacity. The Commission also referred to the testimony of one of plaintiff's witnesses who testified that the quota of plaintiff was only 5 cars a day, the same that had been assigned to the former owner who only operated a lumber mill and had no box manufacturing facilities, but that plaintiff's quota would be raised to 10 cars a day.

In view of the productive capacity of plaintiff's lumber and box manufacturing plants at Oakland and the information concerning such operations which were communicated to defendant and of which defendant had personal knowledge, plaintiff was entitled to a quota in excess of 5 cars a day. However, even on the basis of only 5 cars a day, the evidence showed that plaintiff did not receive its proportionate share of the freight cars as compared to the freight cars received by other shippers.

Plaintiff received an adjusted total of 593 cars during the complaint period or an average of 3.1 cars for each working day. The Commission, in its findings, referred to the testimony of Mr. Forrest, heretofore summarized, who, as a result of his extensive investigations, "claims to have found evidence of delay in filling car orders only at non-competitive points." It also referred to his testimony that Timber Structures, Inc. for whom he acted as traffic manager, "ordered its cars by phone and experienced no difficulty in obtaining cars from the defendant during 1947." This testimony was uncontradicted and, in my opinion, is corroborated by the defendant's own evidence.

Defendant's Exhibit 29, is entitled, "Freight Car Shortage—January 1–September 30, 1947, inclusive, Nationally and S. P. Pacific Lines."

Defendant's Exhibit 31 is entitled "Daily Average Cars Ordered and Furnished Portland Division and Pacific Lines 12/29/46 to 10/4/47."

These exhibits show that, even during the periods in which there was little or no shortage of box cars on the Portland Division of the defendant, plaintiff received only a small proportion of the cars which it required.

*January*

Exhibit 29: During the month of January, there was no shortage of box cars on defendant's lines.

2. This figure is an average of box cars, flats and gondolas. The average for each type of car is: box cars—76%; flats— 85% and gondolas—78%.

Exhibit 31: 83 percent of the box cars ordered were furnished.

Plaintiff received 89 box cars and 12 other cars or an adjusted total of 98 cars.

### April

Exhibit 29: There was a slight box car shortage for the week ended April 19, and no shortage for the weeks ended April 26 and May 3.

Exhibit 31: From the week ended April 4 to the week ended May 3, 92 percent of the box cars ordered were furnished.

Plaintiff received 40 box cars.

### May

· Exhibit 29: No shortage of box cars for the month of May.

Exhibit 31: From the week ended May 10 to the week ended May 31, all box cars ordered were furnished.

Plaintiff received 54 cars, one of which was a flat car.

### June

Exhibit 29: For the weeks ended June 7 and June 14, there was no shortage. For the week ended June 21, there was a slight shortage and for the week ended June 28, a moderate shortage.

Exhibit 31: From the week ended June 1 to the week ended July 5, 97 percent of the box cars ordered were furnished.

Plaintiff received 73 cars, 16 of which were refrigerator cars or an adjusted total of 63 cars.

The Commission may also have relied on the fact that plaintiff was not in competition with any shipper at terminal points where "conditions and circumstances affecting the promptness of cars supplied at terminal points are such as necessarily give shippers there located a natural advantage over shippers at nonterminal points."

I would have regarded this statement of the Commission merely as a comment on a contention of the defendant, except for the fact that the Commission's attorneys, on page 32 of their brief filed in this court, found some connection between such statement and the Commission's conclusions that no competitor of plaintiff was unduly preferred.

█ Nothing in the Act and no decision that I have been able to find permits discrimination as between shippers merely because they are not in the same type of business and therefore do not compete against each other.

The natural advantage of being at a terminal point may on occasions result in more rapid service and a slight difference in the cars made available to such shipper but it can not justify the wide disparity of cars shown by the evidence in this case to have been delivered to shippers at terminal points over a shipper at a nonterminal point.

Considering the whole record, I am of the opinion that there is no substantial evidence upon which the Commission could have concluded that the "defendant did not unduly favor shippers other than the complainant."

VII. "Considering the above, in the light of the facts of this record, we conclude that complainant has failed to establish any violation of sections 1 and 3 as alleged. * * *

"We find that the complainant has failed to establish that defendant during the complaint period engaged in any unreasonable or otherwise unlawful practice, as alleged, in violation of section 1 of the Act, in furnishing or not furnishing cars to complainant at Oakland, Oreg., or that defendant subjected complainant to any undue prejudice in violation of section 3. The complaint will be dismissed."

If this ultimate conclusion refers solely to the preceding conclusions of the Commission, such ultimate conclusion is not supported by substantial evidence and is contrary to law. However, the Commission's statement, "Considering the above in the light of the facts of this record," requires an examination of the evidence adduced at the hearing and particularly the Commission's other findings, to determine whether such evi-

dence or findings afford a rational basis for the Commission's ultimate conclusion.

The only other evidence and the only other finding relied upon by the defendant to support the Commission's ultimate conclusion relate to the length of time plaintiff retained freight cars on its siding.

The Commission, on page 402 of its opinion, stated:

"In a further effort to support its contention that the complainant has no legitimate complaint that the distribution of cars made was other than reasonable, and to rebut the evidence that the complainant was not furnished all the cars needed by it, the defendant shows that a number of cars were kept on hand on the complainant's siding for several days during much of the complaint period. Most of the cars placed on the complainant's siding during the period under consideration were on hand when the 7 a.m. track check was made on only 1 or 2 days. One car was on hand 7 days, 2 cars were on hand 6 days, 11 cars were on hand on 5 days, 22 cars were on hand on 4 days, and 56 cars were on hand on 3 days. The complainant indicates that these may have been cars that were restricted for loading to particular destination areas for which it had no immediate traffic available. During this period the destination of certain cars was restricted by orders of the Car Service Division of the Association of American Railroads. Automobile cars were required to be moved back to automobile production territory, certain gondola cars were required to be moved back to eastern Allegheny territory and to points served by the Denver and Rio Grande Western Railroad Company, and certain other cars owned by Canadian roads had to be moved back to Canada.

"Under emergency conditions such as exist during a period of car shortage, a carrier may be justified in refusing cars to a shipper negligently withholding from shipment cars previously furnished to it. While there is no indication that the defendant's car service practices with respect to the complainant were affected by the holding referred to of cars by the complainant, such holding is relevant in a consideration of the complainant's ability to load cars in addition to those which were furnished."

In view of its other findings, the Commission apparently did not consider the evidence as significant or relevant except in connection with "a consideration of the complainant's ability to load cars in addition to those which were furnished," as to which there was no issue. Defendant did not contend and no evidence was introduced to show that plaintiff, at any time during the complaint period, lacked the necessary facilities or the personnel to promptly load all of the freight cars necessary to satisfy its requirements.

In my opinion the Commission did not intend to support its conclusions by the statements or findings hereinbefore set forth. In addition, an examination of exhibit 42, upon which such statements or findings were based, when considered in the light of the other evidence, reveals its lack of any probative value.

1. Some of the entries in exhibit 42 are inconsistent with the defendant's exhibit 40, which latter exhibit shows the cars furnished plaintiff.

2. A great majority of the cars were moved out within 2 days.

3. When a car was held for more than 3 days, from 13 to 23 other cars were moved in, loaded, and moved out within such period.

4. Of the 664 cars [3] furnished during the complaint period, only 36 were found to be on plaintiff's siding for more than 3 days, when the daily 7 a.m. track check was made.

3. The 593 figure heretofore used in this opinion is the adjusted figure. For explanation see footnote 2 of this opinion.

5. During the months of August and September, 35 percent and 60 percent of all cars furnished plaintiff were not box cars, but were refrigerator, stock, flat or gondola cars. The same situation obtained, to a lesser extent, in other months during the complaint period. A number of these cars were of limited value to the plaintiff. The automobile and refrigerator cars were restricted to particular destinations and the refrigerator cars could only be used for the shipment of boxes and they could only be loaded by hand.

It is apparent therefore that the statements of the Commission relative to the length of time cars were retained on plaintiff's siding do not support the Commission's conclusions.

VIII. "Moreover, the evidence presented falls far short of the requirements in a proceeding of this character to support an award of reparation. Where special damages are sought, the proof thereof must be as definite and certain as would be necessary under established principles of law to support a judgment in court. Lignum-Vitae Products Corp. v. Alabama G. S. R. Co., 268 I.C.C. 599, 608."

■ Plaintiff admits that several of the items of damage which it originally claimed were not properly chargeable to the defendant and that other items were so indefinite and speculative as to offer no reasonable basis for an award of damages. All of such items were properly disallowed by the examiner. However, the record does contain evidence of damage as to other claims which will support an award of reparations. A railroad which has violated its statutory duty and has caused a shipper to suffer damage will not be permitted to escape liability solely because the shipper is unable to prove the exact amount of damage suffered. Midland Valley R. Co. v. Excelsior Coal Co., 8 Cir., 1936, 86 F.2d 177, 183.

■ I am in complete accord with the rule that the conclusions of the Commis-sion shall not be overturned except in the rare instances in which there is no rational basis for such conclusions. When a court finds it necessary to overrule a decision of such expert administrative tribunal, I believe that it should set forth in detail the reasons which impel such action. That is my only justification for such a long opinion.

For the reasons heretofore set forth, plaintiff is entitled to a judgment remanding this matter to the Commission for further findings in conformity with this opinion.