Cosima D. MacINNIS, Individually, doing business as Wren Planing Mill, and Cosima D. MacInnis, as Executrix of the Estate of A. L. MacInnis, Deceased, Plaintiffs,

v.

INTERSTATE COMMERCE COMMIS-SION and United States of America, Defendants, and Southern Pacific Company, Intervening Defendant.

Civ. No. 8432.

United States District Court
D. Oregon.

June 22, 1959.

William P. Ellis, of Ellis & Ellis, Portland, Or., James E. Lyons and Charles W. Burkett, Jr., San Francisco, Cal., for plaintiffs.

Robert Ginnane, Washington, D. C., for defendant Interstate Commerce Commission.

C. E. Luckey, U. S. Dist. Atty., Portland, Or., for U. S.

James C. Dezendorf and George B. Campbell, of Koerner, Young, McColloch & Dezendorf, Portland, Or., for intervening defendant Southern Pacific Co.

EAST, District Judge.

The segregated issue of the petition of Cosima D. MacInnis, individually, doing business as Wren Planing Mill, and Cosima D. MacInnis, as Executrix of the Estate of A. L. MacInnis, deceased (Wren), and Wren's claim for damages and reparations from Southern Pacific Company (SP) arising out of alleged unlawful acts and conduct of SP was heretofore submitted to this court for determination by order of the three-judge court heretofore empaneled to hear the plaintiffs' petition and cause herein.

The aforesaid three-judge court has has heretofore determined and ordered the plaintiffs' petition and cause dismissed on the ground and for the reason that SP had not violated its statutory authority nor been guilty of undue discrimination, and that otherwise the con-

tested orders of the Commission were valid. Shippers' Car Supply Committee v. I. C. C., D.C., 160 F.Supp. 939; affirmed 358 U.S. 45, 79 S.Ct. 36, 3 L.Ed. 2d 44.

Quoting from Wren's brief, its assertions as to the issues involved are as follows:

"Had the general complaint decision been favorable to Shippers' Car Supply Committee, Wren's damages, conceivably, could have been shown as $154,385.86. That figure is reduced by the adverse decision in the general complaint case to $61,343.26, or approximately a 60% reduction.

"The issues are reduced even more. We must start with the assumptions, in line with the three-judge ruling, that there was no discrimination against Oregon (Mills) in the furnishing of cars, and that Southern Pacific is in no way responsible for the general shortage of cars. There remains only the issue as to whether or not Wren received a fair and reasonable treatment from Southern Pacific with respect to car service and number of cars furnished, which depends solely upon a comparison of the treatment received by Wren with that received by other shippers in Oregon at the same time.

"It would perhaps be well to emphasize here, also, that while the testimony with respect to the general case covered a period of several years, the damage claim is restricted to a period of less than 4 months, specifically, from June 12, 1950, to September 30, 1950." [Parenthetical word supplied.]

The defendants Interstate Commerce Commission and United States of America (Commission), in effect, assert the issue as follows:

The issue as presented to this court is not the broad question of discrimination against Wren as claimed by Wren, but the more restricted issues which a court review of a Commission order is limited to:

(a) Whether the Commission's findings are sufficient to support its determination that Wren was not discriminated against;

(b) whether, apart from the findings, there is substantial evidence in the record to support the ultimate conclusion reached; and

(c) whether an error of law entered into the Commission's determination.

As Judge Solomon said in Martin Brothers Box Co. v. Interstate Commerce Commission, D.C., 128 F.Supp. 919, 921:

"* * * This court is limited to determining whether there was a rational basis for the final order of the Commission and, unless the order is not supported by substantial evidence or is contrary to law, it may not be disturbed."

The basis of Wren's complaint is a claimed violation, so far as Wren is concerned, by SP of §§ 1(4), 1(11) and 3(1) of the Interstate Commerce Commission Act, 49 U.S.C.A. §§ 1(4, 11), 3(1) quoted as follows:

"A railroad, under § 1(4), § 1(11) and § 3(1) of the Act, is required:

"1. To furnish transportation upon reasonable request.

"2. To establish and enforce reasonable rules with respect to car service.

"3. To refrain from causing any undue influence or unreasonable preference or advantage to any particular person, company, locality or territory.

"4. To treat shippers fairly, if not identically, in case of a car shortage. (128 F.Supp. 919, 926)"

Wren in its brief candidly admits that its case stands or falls upon the "crucial issue" of discrimination or nondiscrimination of Wren as shown by the "various rated capacities" assigned by SP to the various sawmills, including

Wren, along the Corvallis-Toledo branch of SP and that SP was discriminatory against Wren *in fixing Wren's rating.*

Quoting from Commission's reply brief, which is tacitly joined in by SP in its brief:

"In regard to the ratings assigned to lumber mills on Southern Pacific lines in Oregon, it must be recalled that the procedure in question was instituted in 1950 for about 436 mills (Tr. 1099). Prior to that time, two meetings, attended by lumbermen and transportation officials, failed to generate any significant aid from the lumber industry of Oregon in an attempt to solve the problem. The lumbermen of the Rogue River Valley were asked in 1948, at a meeting in Grants Pass, Oregon, to aid the Southern Pacific by forming a committee to give ratings to the various mills. The lumbermen decided against it for fear of divulging trade secrets. (Tr. 1095–1097).

"In 1950, a similar meeting was held in Eugene, Oregon, but the Southern Pacific received no constructive aid in the matter of mill ratings as was requested. (Tr. 1097–1098).

"During the car shortage of 1950, distribution of available cars to lumber shippers in Oregon was made on the basis of capacity ratings of the various mills. The Southern Pacific station agents in Oregon were ordered to gather data on the shipping potential of the lumber mills in their respective localities. According to the plan, the basic information was supplied by the shippers themselves (Tr. 802–803). This information was reflected in the so-called 'Agent's 50 Reports.' It was realized that the first reports were not 100 percent perfect, and the railroad revised them periodically and made continuing efforts to improve their accuracy and usefulness (Tr. 1098–1099). Moreover, the three-judge case establishes the fact that there was a general car shortage on the Portland Division during the summer of 1950.

"Wren's original rating of four cars was based on information that Wren's production was 135,000 feet. The Southern Pacific agent at Corvallis forwarded this basic production information with the notation that it was furnished by Mr. A. L. MacInnis, owner of Wren (Tr. 806–807).

"George Leslie, the Southern Pacific official in charge of the ratings for the various mills, later changed Wren's rating to five cars. This action was apparently based on a subsequent letter from Mr. MacInnis indicating that his production or capacity had increased. This same official did not recall Mr. MacInnis' writing to the effect that Wren's total capacity was about 200,000 feet (Tr. 807–808). In this connection it was testified:

"Q. Didn't he write you to the effect that he had 140,000 capacity in his resaw and 200,000 for the planing mill, 200,000 planing and loading capacity? A. [Leslie] If he did, I don't recall it.

"Q. Do you have with you any such information showing what Mr. MacInnis wrote you on that subject? A. Can you tell me about when?

"Q. It would have to be, of course, some time before you made up your Agent's 50 Report. A. Would it be prior to April 3rd, 1950?

"Q. When do you think you received it? You say you did receive it? A. I don't recall the letter on 200,000. That figure I would, I believe, it would have stuck in my mind if it was 200,000 on one and 130,000 on another.

"Q. He is shown in the current directory for that period as having a resaw capacity of 140,000 and a total capacity of 200,000 planing and loading, and are you sure Mr. MacInnis

didn't furnish you that figure? A. No, I'm not sure, *but I know that if he told me it would be 200,000 that his capacity rating would be almost put at seven cars per day, and at no time has his capacity rating been above five cars.* [Emphasis added]

"As in the case of Wren, the board-foot production of the mill generally determined the rating. This was true of the Benton County Lumber Company, located on the Toledo Branch, which indicated a production of 75,000 feet and was assigned a rating of two cars. (Tr. 805).

"In some instances, as where a mill shipped outside lumber, in addition to its own production, loading capacity as well as production capacity was taken into account by the Southern Pacific in assigning a rating. (Tr. 1063–64). This theory apparently applied to the Corvallis Lumber Company, located on the Toledo Branch, which produced 125,-000 feet and was given a rating of six cars. The railroad agent indicated six cars for the mill, which was apparently based on the mill's shipping outside lumber (Tr. 804). Similarly, Coast Pacific Lumber Company, working two shifts and with a production of only 175,000 feet was given a rating of 20 cars. This was based on receipt of outside lumber and a 10-car loading capacity per shift (Tr. 1053). On the other hand, Coos Bay Lumber Company, producing 350,000 feet and working two shifts, was rated at six cars. This was because much of its output moved via water carriers. (Tr. 1054).

"It is pertinent that the Oregon Public Utilities Commissioner was a complainant in the original proceedings before the Interstate Commerce Commission, and that one of its employees, Mr. T. W. Dench, testified that in his opinion the Southern Pacific did the best it could to distribute its cars equitably and fairly among shippers in Oregon in 1950 (Tr. 432–433)."

This court is satisfied from the record made by the Commission and now before this court that SP's five-car rating for Wren assumes the production of approximately 150,000 board feet per day, whereas the investigating accountants (Hutchison, Jolma & Company) determined Wren's actual average production to be 127,584 board feet per day (Ex. No. 78, Schedule "E") and that the rating itself was patently fair to Wren.

Further, that Wren was treated fairly with respect to car distribution when compared with its neighbors on the Corvallis-Toledo branch.

In conclusion, this court finds that the ratings assigned to Wren and the other mills were fairly and equitably drawn; that Wren's rating was equitable and properly related to its actual production experience; that Wren received as great a proportion of actual car requirements as did other shippers in Oregon, on the Toledo branch and elsewhere; and, further, that the Commission's report and order in the above respects are adequately and fully supported by substantial evidence of record and are fully compatible with law. Having reached this conclusion, it is unnecessary for the court to consider Wren's claim for an award of reparations from SP, which was denied by the Commission upon either one of the "car orders filled" or "transit sales" theories.

Therefore, it is considered, adjudged and ordered that Wren's complaint and cause herein are each dismissed.